Pages 1 - 95

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

Before The Honorable H.S. Gilliam, Jr., Judge

APPLE, INC.,                    )
                                )
            Plaintiff,          )
                                )
    VS.                         )    NO. 4:22-CV-07608-HSG
                                )
ALIVECOR, INC.,                 )
                                )
            Defendant.          )
_____ )


                        Oakland, California
                        Friday, August 22, 2025

                **TRANSCRIPT OF PROCEEDINGS**

**APPEARANCES:**

For Plaintiff:
                KIRKLAND & ELLIS, LLP
                695 Town Center Drive, Suite 1700
                Costa Mesa, CA 92626
            BY: **MICHAEL W. DE VRIES**

                KIRKLAND & ELLIS, LLP
                555 California Street
                San Francisco, CA 94104
            BY: **ADAM R. ALPER**
                **AKSHAY S. DEORAS**
                **ATTORNEYS AT LAW**

                KIRKLAND & ELLIS, LLP
                401 Congress Avenue
                Austin, TX 78701
            BY: **KAT LI**
                **ATTORNEY AT LAW**

(Appearances on following page.)

REPORTED REMOTELY BY: Stephen W. Franklin, RMR, CRR, CPE
                      Official United States Reporter

**APPEARANCES (CONT.'D):**

For Plaintiffs:

                    KIRKLAND & ELLIS, LLP
                    333 West Wolf Point Plaza
                    Chicago, IL 60654
          **BY:  GREG POLINS**
               **ATTORNEY AT LAW**

ALSO PRESENT:         Garrett Sakimae, Apple, Inc.

For Defendant:

                    ALSTON & BIRD, LLP
                    1120 South Tryon Street, Suite 300
                    Charlotte, NC 28203
          **BY:  MATTHEW S. STEVENS**
               **ATTORNEY AT LAW**

                    ALSTON & BIRD, LLP
                    55 2nd Street, Suite 2100
                    San Francisco, CA 94105
          **BY:  PHILIP C. DUCKER**
               **MICHELLE ANN CLARK**
               **KATHERINE G. RUBSCHLAGER**
               **ATTORNEYS AT LAW**

ALSO PRESENT:         Bill Jacobs, AliveCor, Inc.

| | |
|---|---|
| 1 | **<u>Friday, August 22, 2025</u>**                    **<u>9:59 a.m.</u>** |
| 2 | <u>P R O C E E D I N G S</u> |
| 3 | ---o0o--- |
| 4 | **THE COURTROOM DEPUTY:**  And, Your Honor, we're calling |
| 5 | CV 22-7608, Apple, Inc. versus AliveCor, Inc.  Please step |
| 6 | forward and state your appearances for the record, please. |
| 7 | **MR. DE VRIES:**  Good morning, Your Honor.  This is |
| 8 | Mike De Vries on behalf of the plaintiff, Apple.  With me here |
| 9 | today are Adam Alper, Kat Li, Akshay Deoras, Greg Polins, and |
| 10 | from our client, Garrett Sakimae. |
| 11 | Good morning, Your Honor. |
| 12 | **THE COURT:**  Good morning. |
| 13 | **MR. STEVENS:**  Good morning, Your Honor.  I'm Scott |
| 14 | Stevens from Alston & Bird behalf of defendant AliveCor.  With |
| 15 | me from Alston are Phil Ducker, Michelle Clark, Katherine |
| 16 | Rubschlager, Mr. Robert Wilson is helping us today with the |
| 17 | graphics, and our client represented in the room is Bill |
| 18 | Jacobs, the general counsel of AliveCor. |
| 19 | Good morning. |
| 20 | **THE COURT:**  Good morning. |
| 21 | All right.  So we're here for the claim construction |
| 22 | hearing.  I got your filing yesterday.  It seemed to be pretty |
| 23 | good news, and really the upshot is two things:  One is that |
| 24 | the disputed terms are down to seven, and of those, the parties |
| 25 | are agreeing to submit two on the papers, which is an |

1    interesting idea.  I haven't seen it before.  I encourage you

2    to think about it more.

3        So that means we've got five terms to be argued today.

4    Now, obviously I had set aside three hours, but this should

5    well shorten that, and at least in my mind to what I would

6    envision is about two hours.

7        What are the parties planning?

8        **MR. DE VRIES:**  Your Honor, that sounds just fine to

9    us, and we may not even need that much time.  There's been a

10   further development as I understand it.  Agreement has been

11   reached on the "indication of progress" term, so I believe that

12   leaves now four terms for discussion.

13       **THE COURT:**  I see.  And so that was, I see, in the

14   '533?

15       **MR. DE VRIES:**  Yes, Your Honor.

16       **THE COURT:**  All right.  Do you want to put that on

17   the record, or do you want to submit a supplemental filing just

18   along the lines of what you filed yesterday?  Either is fine

19   with me.  It probably makes sense to just submit something so

20   that it's totally clear for the record what the agreement is.

21       **MR. DE VRIES:**  Yes, Your Honor.

22       **MR. STEVENS:**  Yes, Your Honor.

23       **THE COURT:**  All right.  Okay.  So four claims.  How

24   long do the plaintiffs envision that will take?

25       **MR. DE VRIES:**  I believe that we will need

1    approximately on our side an hour or so for those four claims.

2          **THE COURT:**  All right.  Fair enough.

3       Similar?

4          **MR. STEVENS:**  I completely agree.

5          **THE COURT:**  All right.

6          **MR. STEVENS:**  Same over here.

7          **THE COURT:**  Okay.  That sounds like a good plan.

8       And in terms of the order, the parties had proposed ...

9    you did have a proposed order.  Where was it?  I see.  Yeah, so

10   it was on page 3 of your filing, although now "indication of

11   progress" is out, right?

12         **MR. STEVENS:**  Correct.

13         **MR. DE VRIES:**  Yes.

14         **THE COURT:**  Okay.  So we would be starting with the

15   '257 patent terms, which seems fine.

16      One thing I, just as to each of the terms, what I'd like

17   counsel to do at the beginning of your presentation is just say

18   two things:  One is, are you proposing a different construction

19   than you advanced in the IPR proceeding?  And I don't really

20   need to know why or have an argument about why that does or

21   doesn't matter.  I just want to know if it's different.

22   Second, I want to know whether the party is relying in whole or

23   in part on a disavowal-type argument based on what happened in

24   the IPR.  And then why don't you just tell me those two things.

25   I don't really need to engage with the argument about it, but I

1  just want to have a clear record as to each of those before we

2  get into the merits of the argument.

3            **MR. DE VRIES:**  Yes, Your Honor.

4            **MR. STEVENS:**  Understood.

5            **THE COURT:**  All right.  So '257.  Who's up first?

6            **MR. DE VRIES:**  I think we're prepared to go first on

7  behalf of the patent owner if that makes sense, Your Honor, and

8  I think that we would deal with the "underneath" term first, if

9  that's okay.

10            **THE COURT:**  Fine with me.

11            **MR. STEVENS:**  That's fine with us.  And Michelle

12  Clark will present for AliveCor on this term.

13            **THE COURT:**  Sounds good.

14            **MR. DE VRIES:**  Your Honor, we do have paper copies of

15  slides if you would like.

16            **THE COURT:**  Sure.  Why don't you hand them up.

17            **MR. DE VRIES:**  Okay.

18            **THE COURTROOM DEPUTY:**  Copies, please.

19            **MR. DE VRIES:**  Yes.

20            **THE COURTROOM DEPUTY:**  Thank you.

21            **THE COURT:**  All right.  Whenever you're ready.

22            **MR. DE VRIES:**  Thank you, Your Honor.

23        So again, this is Michael De Vries for the court reporter,

24  and I'm going to be addressing first the phrase in the '257

25  patent Claim 1 that includes the word "underneath," and I've

1    shown the phrase that I'm talking about on this slide, and the

2    parties' respective positions.

3        I'm going to start exactly where Your Honor asked, and

4    that is are we offering a different construction for this term

5    than we did in the IPR.  The answer is "no," we're still

6    offering plain and ordinary meaning.  There was a lot of

7    discussion in the IPR about what exactly this term meant, and

8    so I think to give Your Honor the most accurate answer, there

9    was a lot of back and forth about sort of what that meant, and,

10   but our position remains the same.

11       And then in terms of your second question, are we

12   suggesting that there was a disavowal during the IPR

13   proceeding, the answer is "no."  We understand that AliveCor is

14   making that type of an argument, but we disagree with it for

15   reasons I can explain.

16       All right.  So let me just get into the issues, Your

17   Honor.

18       So here for the "underneath" term, Apple is proposing

19   plain and ordinary meaning.  We think that the language of the

20   claim is clear and needs no construction.  AliveCor seems to

21   agree with that in part.  Their proposal is plain and ordinary

22   meaning, but in addition to that, they're asking Your Honor to

23   add a negative limitation to the claim.  So they're asking Your

24   Honor to add a statement that in addition to the plain and

25   ordinary meaning of the language, that that cannot include an

1    exposed first pad or electrode, and we think adding that

2    negative limitation is wrong for a number of reasons.  And I

3    think at a high level I'm going to address, Your Honor, both

4    the "underneath" and "embedded" terms.

5         And in both cases, AliveCor is proposing a construction

6    that really violates fundamental claim construction law.

7    They're excluding embodiments in both cases and I think in both

8    cases are proposing some form of prosecution history disclaimer

9    either during the original prosecution or IPR that is not

10   justified by what's in that record, and it is inconsistent with

11   the law governing those types of disclaimers.

12        **THE COURT:**  And just one framing principle.

13   Obviously one of the trickiest issues for us district judges to

14   deal with is plain and ordinary meaning and navigating the

15   Federal Circuit's *O2* decision, because the risk I think is that

16   plain and ordinary meaning can sometimes mean kick it down the

17   road and we'll decide later, and I can't do that.  But I think

18   the way that I have read *O2* is that if there is a dispute here

19   both parties are arguing plain and ordinary meaning, and I

20   could resolve the dispute by saying either plain and ordinary

21   meaning does or doesn't include the limitation that the

22   plaintiffs are proposing.  So it could be plain and ordinary

23   meaning, but you can't argue that that is what's proposed.

24        Do you agree that that is consistent with what *O2 Micro*

25   requires?

1    **MR. DE VRIES:**  In short, Your Honor, yes, we

2    100 percent agree that you will fully comply with *O2 Micro* by

3    deciding whether or not to add AliveCor's negative limitation.

4    And *O2 Micro* does not, for example, require Your Honor to now

5    replace the remaining words of the claim that the parties agree

6    on with different words.

7            **THE COURT:**  Fair enough.

8            **MR. DE VRIES:**  Okay.  So we'll start with the law.

9        As Your Honor knows, I know, the words of the claim are

10   generally given their plain and ordinary meaning except in two

11   circumstances:  One where the patentee sets out a specific

12   definition called, you know, where the patentee is a

13   lexicographer, or there's been a disavowal either in the

14   specification or during prosecution.

15       Here the claim -- well, I'll talk about Claim 1 --

16   describes an electronic device, and that comprises a few

17   things.  It comprises an enclosure and also a heart sensor, and

18   the heart sensor comprises a first lead, which in turn

19   comprises a first pad.  And then the language that we're

20   looking at here, wherein an exterior surface of the enclosure

21   comprises an exterior surface of the first portion, wherein the

22   first pad is positioned underneath the exterior surface of the

23   first portion.  On the next page I've highlighted what I think

24   is the key aspect of that limitation, and that is that the

25   first pad is positioned underneath the exterior surface of the

1    first portion of the enclosure.

2         And if we look, as we should, at the claim language first,

3    "underneath" -- and the language here says nothing about

4    expose.  So there's nothing about the claim language that says

5    that you cannot have an exposed pad in order to be underneath.

6    It does not say entirely underneath.  And if you think about

7    the ordinary usage of the word "underneath," as an example, if

8    someone's underneath the covers, that doesn't mean, for

9    example, their foot couldn't be sticking out.  So there's

10   nothing about the word, the plain and ordinary meaning of the

11   word "underneath," that requires the entirety of the pad to be

12   underneath the first portion of the enclosure.

13        If we look at the specification, when the specification

14   uses the term "underneath," it uses it consistently with its

15   plain and ordinary meaning.

16        So I'm showing Your Honor a portion of column 9, which

17   describes Figures 1 -- 4A and 4B.  And in the 4B figure there's

18   a lead that's described.  And in the portion of column 9 that

19   I'm describing it talks about two alternatives, and one is when

20   the lead of the heart sensor can be positioned against the back

21   surface of the bezel, that's what's described there.  And then

22   it says:  Alternative, the lead could be placed within the

23   thickness of the bezel, but underneath the outer surface of the

24   bezel.

25        And so the use of the word "underneath" in the

1    specification is just very consistent with its plain meaning.

2         **THE COURT:**  In Figure 4B, I'm assuming that where the

3    user would be contacting the device is on the top left, you

4    know, so that that, the -- in this instance there would be no

5    direct contact with the lead, at least in this drawing.

6         **MR. DE VRIES:**  In that drawing that's absolutely

7    correct, Your Honor.  That is right.  And the claim talks about

8    that to some extent, and I'm going to come back to that to

9    fully address that.

10        But the word "underneath," just as in the concept of

11   somebody who's underneath the covers, doesn't mean that you

12   could not have in any circumstance a portion of the pad that is

13   exposed to the outside.  So we've given a couple of diagrams

14   here that show that.

15        You've got a pad, you've got that pad is underneath a

16   first portion of the enclosure in both circumstances, but that

17   doesn't mean that there could never be any part of the pad that

18   is exposed.  And so the claim language and the specification

19   doesn't require that kind of a reading.  And in fact that would

20   be wrong, because the specification clearly describes exposed

21   pads, and there's no disagreement about that.

22        And so the word "pad" shows up several times in the

23   specification, and it's described, for example, at column 6,

24   lines 25 to 33, where it says in relevant part:  A pad can be

25   placed on the outer or inner surface of an electronic device,

1   bezel or housing.  And then in the abstract it describes that

2   the pads can be finished to ensure that the pads are not

3   visibly or haptically distinguishable on the device.  And

4   that's, in that circumstance they are exposed pads, but they've

5   been, you know, changed in some way so they're not visibly

6   distinguishable.

7        And as I said, there's really no dispute that the '257

8   patent discloses exposed pads.  And so this is from AliveCor's

9   response brief at page 12.  They explain that there is no

10  dispute that the '257 patent discloses embodiments that include

11  exposed electrodes, including Claim 1's second lead pad.

12       Now, what AliveCor says is that the portions of the

13  specification that we're pointing to that talk about an exposed

14  pad are talking only about the second pad in the claim.

15  There's a second pad described in Claim 1.  But that's not

16  right.  If you look at each and every discussion of the pads

17  and the fact that they can be exposed in the specification,

18  that those discussions are not limited in any way to a

19  discussion of the second pad that's described in the claim, but

20  rather describe all pads generally.

21       For example, when we're pointing to column 6, lines 25 to

22  33, in relevant part it explains that each lead can include a

23  pad or extended area placed on the outer or inner surface of an

24  electrode device, bezel or housing.  And so the language about

25  exposed pads that the parties agree exists in the patent is

1    definitively not limited to a second pad.

2        And so what is it AliveCor is asking Your Honor to do?

3    AliveCor is asking Your Honor to add words that are not

4    included in the claim.  And in particular I'm going to focus on

5    this part first.  I'm going to come back to the electrode

6    issue, Your Honor.  They explain that they want Your Honor to

7    add some words at the end of the claim language that says:

8    Wherein the first pad is positioned underneath the exterior

9    surface of the portion and is not exposed, or words to that

10   effect.  And as I have explained, that's not required by the

11   claim language and would be inconsistent with the

12   specification.

13       One thing AliveCor mentions is that there's a part of

14   Claim 1 that talks about what I've highlighted in green:

15   Wherein the first pad is configured to detect a first

16   electrical signal of the user's cardiac signal via the user's

17   skin contact with the exterior surface of the first portion of

18   the enclosure, and that language appears in the claims.  What

19   we're depicting here, which is consistent with what we've shown

20   in the earlier graphics, is that nothing about that requirement

21   means that there cannot be any portion of the pad that is

22   exposed.  As illustrated here, you have a pad.  It's positioned

23   underneath the exterior surface of the enclosure.  There's an

24   exposed portion of the pad, but there's still an electrical

25   signal that's being detected via a contact with the enclosure.

So there's nothing about that part of the claim that means we
have to add a negative limitation disallowing any configuration
that has any portion of the pad exposed.

**THE COURT:**  Well, that's sort of a -- would be a
strange invention.  What would be the point of having an
exposed part of the pad that is not where the signal's
detected?  I get your point about the theoretical
possibilities, but that just seeing it laid out there seems a
little odd.

**MR. DE VRIES:**  Well, I think there could be various
technical reasons for that.  I mean, perhaps there's a
temperature aspect, like the pad is on top of a portion of the
device and the user is contacting the pad through the
enclosure, but you have some kind of a, you know, air hole or
something, for lack of a better word, in the enclosure.  And so
a portion of the, you know, a small portion of the pad is for
some reason not beneath that portion because of temperature
control reasons, but it doesn't change the way that you're
using the pad consistent with the invention.

And to be clear, we're not asking Your Honor to not
consider or take away the language that's in green.  Like that
remains there as a requirement of the claim.

And so as I said, the construction would exclude
embodiments that the parties agree are there, and under the law
excluding embodiments is something that is rarely, if ever,

correct.  And so that part of the negative limitation is one

that's not right either under that law.

The last thing I'll say before getting into the

prosecution is that the -- in addition to the issue that we've

been discussing, AliveCor's asking Your Honor to include the

word "electrode" in a construction to say pad slash electrode,

and we think that would be incorrect to add that word, because

as the parties agree, that word is never used in the '257

patent.

What AliveCor says, as I'm showing on the next slide, is

that the word "electrode" so proliferates the intrinsic record

without appearing in the patent itself, that AliveCor asks the

Court to orient the trier of fact to the significance of the

term in relation to the claim language.  But if you, you know,

as I'm showing here, when you look at the statements that the

applicant made during prosecution here with respect to the

Gilles prior art, what was happening was that there was a

reading of the prior art equating the electrode with the pad,

and the applicant engaged with those arguments to explain why

even if that's right there would still not be satisfaction of

the claim requirements, but clearly said that they did not

accept that the prior art's reference to certain features was

the same as the pad in the patent.

And so we think that there's no reason to, and it would be

incorrect to add an additional word into that construction,

especially one that frankly is pretty confusing to say pad

slash electrode.  I don't exactly know what the jury does with

that.

And so finally, where is it that AliveCor is getting its

construction from?  Why does it ask the Court to add this

negative limitation?  What it says in its brief is that if you

look at the statements throughout prosecution, both during the

original prosecution and the IPR, that they foreclose an

exposed electrode design.  That's a general statement they make

in the brief.

And then --

**THE COURT:**  And here you can skip over the law.  I

know the law on this.

**MR. DE VRIES:**  Yep.

And so what is important is that the characterization of

the applicant's statements during prosecution we disagree with,

and because you have to have a clear and unmistakable disavowal

of claim scope, it simply doesn't exist.  What you'll see is

time and again the applicant was not using unclaimed elements

to distinguish the prior art, but they were using the elements

that are found in the words of the claims to distinguish the

prior art.

So for Ceballos, for example, the applicant argued that

the electrode, which was supposed to be the pad, is not

positioned underneath.  Same for Weiss.  The argument was that

1   the electrode was not positioned underneath.  And for Giles,

2   actually they were talking, which is cited by AliveCor, they

3   were talking about a different limitation entirely, which is

4   "embedded in."

5       And so nowhere in the prosecution will you see statements

6   from the applicant that the reason that the prior art doesn't

7   satisfy the claims is that putting aside whether it's

8   underneath or not, there's an exposed electrode.  The applicant

9   was focused on the claim language that already appears in the

10  claim, and it would be improper under the law to add an

11  additional requirement that was not what the applicant was

12  arguing and was not necessary in order to avoid the claim.

13      The same is true in the IPR.  And so I'll be brief here,

14  but when the applicant distinguished Markel, which was the

15  primary reference in the IPR, again, the applicant explained

16  that the electrode pad was not underneath an enclosure.  It was

17  not positioned under the exterior surface.  The electrode was

18  not underneath an exterior layer.  And so they were relying on

19  the claimed elements of the claim, not asking the patent office

20  to add in some additional unclaimed element in order to satisfy

21  the -- in order to find that the prior art didn't satisfy the

22  claim.

23          **THE COURT:**  And I take it your position is that

24  definitively there is nowhere in either the original

25  prosecution record or the IPR in which prior art was

```
 1  distinguished based on it not involving an exposed pad or
 2  electrode?
 3           MR. DE VRIES:  The word "exposed" comes up at some
 4  times to talk about the way in which the electrode is
 5  positioned on a particular prior art, but as the law that, you
 6  know, what I was going to show Your Honor, says, discussing the
 7  prior art and its attributes doesn't amount to a disclaimer.
 8  You have to look at what the argument was that the applicant
 9  was making.  And in each case, what the applicant was making
10  and arguing in the IPR context also to the PTAB was that the
11  "underneath," or in these examples "embedded in" limitations
12  were not satisfied by the prior art.
13       There's just two other points I'll make.  One is that
14  there is a statement that, in the Apple's patent owner response
15  in the AliveCor IPR that AliveCor points to.  It's the one in
16  the middle of the page here.  And what AliveCor says is that in
17  this statement we're agreeing with them that there can be no
18  exposed pad.  That's not right, and it's a misreading of this
19  statement.
20       What the statement says is that here AliveCor had
21  essentially misread our infringement contentions in this case
22  and had understood us to be saying that the claimed first pad
23  and the first portion of the enclosure could be met by a single
24  exposed electrode pad.  And Apple said, no, that's not our
25  position.  Our position, as you can see in the next sentence,
```

is that those pads are distinct components.  You have, on the
one hand you have a pad, and then on the other hand an
enclosure, and those need to be distinct.  It was not saying
you need to interpret this to disallow all exposed pads.

And finally, that's exactly how the PTAB treated this
issue in the final written decision.  And so, to be sure, the
PTAB came up with a construction.  It sort of to some extent is
describing what it found to be a somewhat confusing discussion
of this issue amongst the parties, and where it talked about a
position that was attributed to Apple that Apple wasn't taking,
and then something that AliveCor was talking about as a correct
interpretation.

What they ultimately concluded didn't include any
disavowal of an exposed pad or electrode, so their construction
didn't include what AliveCor's asking Your Honor to include.
What they found on the merits was that Markel didn't show --
I'm showing this in blue -- a separate electrode component
underneath a conductive plaster layer.  And so, again, they
were finding a distinction based on the word "underneath" there
and not based on "exposed pad" or "electrode."

And so for that reason there certainly from our
perspective is nothing in the prosecution history to support
that negative limitation and certainly nothing that could ever
satisfy the standard for doing that.

Unless Your Honor has any other questions, that's it.

```
 1                THE COURT:  I don't.  Thank you.

 2                MR. DE VRIES:  Thank you.

 3                THE COURT:  Defense.

 4            MS. CLARK:  Preferred placement is me here, right?

 5            THE COURTROOM DEPUTY:  It's not the preferred.  I

 6   said, if you prefer.

 7                THE COURT:  It's up to you.  You can use the podium

 8   there, you can be there.  It's up to you.

 9            THE COURTROOM DEPUTY:  I just decided to tell the

10   attorneys you can stand at the monitor if that's what you

11   choose.

12            MS. CLARK:  Do you have a preference, Your Honor?

13            THE COURT:  I don't.

14            MS. CLARK:  All right.  I'm going to stand to the

15   podium because I'm used to it.

16       Well, good morning, Your Honor, and thank you for taking

17   the time to spend with us.  My name is Michelle Clark, and I

18   represent AliveCor.  I am here to talk about and address this

19   very long phrase in Claim 1 of the '257 patent, which, if

20   you'll indulge me, I just call the "underneath" term, because

21   otherwise it's a lot of words.

22       So to answer Your Honor's prefatory questions:  First, no,

23   we are not offering a different construction than was offered

24   before the PTAB.  We agree with Apple's counsel that no

25   official constructions were formally provided in the IPR
```

proceedings on this particular claim term.  And second, as to

the question of whether or not we're relying in whole or in

part on disavowal, I'm going to say, "yes."

    **THE COURT:**  The answer is "yes."

    **MS. CLARK:**  The answer is "yes," and I will explain

why.

   So, let's see here.  So we believe, right, that our

proposed construction is simply an applicant of the claim's

express requirements which collectively foreclose an exposed

electrode design.

   So if you see here, while we believe that the language of

the claim itself is clear, we do also in our briefing offer a

plethora of intrinsic support for the proposed construction,

such that should Your Honor be disinclined to agree with us

that that plain language of the term itself forecloses an

exposed electrode design, we -- for, you know, at least a dozen

instances where Apple has disclaimed an exposed electrode if we

have to go the prosecution history disclaimer route.

   I'm only raising this option now, frankly, because I don't

think we were aware that there was a real dispute until the

reply brief.  That is, we knew that Apple believed this term

didn't need to be construed, but it wasn't until Apple's reply

brief that the substantive dispute between the parties really

crystallized and demonstrated why perhaps we are not all in

agreement about the requirements of the claim, and it might be

 1    a disavowal.

 2            **THE COURT:**  But I just disagree with that premise.

 3        I'm looking at page 5 of their brief.  Even if "electrode"

 4    were removed from AliveCor's negative limitation, nothing in

 5    the intrinsic record supports prohibiting the claimed pad from

 6    being exposed.  I just don't think it's credible to say that

 7    you only knew this in the reply.  That was their argument from

 8    the beginning.

 9            **MS. CLARK:**  So I understand that.

10        I think that, like I said, what I didn't understand, and

11    perhaps this is my own failing, is that the combination of the

12    elements, right, to my mind requires that the electrode be

13    fully covered, right, because as Your Honor pointed out during

14    Apple's discussions, there's -- we're not just talking about

15    the "underneath" limitation.  We're talking about the fact that

16    it has to be both embedded and positioned underneath the

17    exterior surface of the first portion, right, and then

18    configured to, and then coupled to the connector.  Those are

19    the structural limitations.  But there's also, right, this

20    functional limitation, which is that it has to be configured to

21    detect a first electrical signal via the user's contact with

22    the exterior surface of the first portion of the enclosure.

23        And to the extent that's true, if -- by the very nature of

24    the pad being an electrode, right, if the user was touching the

25    pad, it would be detecting the cardiac signal via contact with

the pad.  And so this is I think where perhaps we had some

confusion, but I think that that aside, you don't have to agree

with me, I understand, we nonetheless think that the -- it's

inherent in these four requirements of the claim that the pad

cannot be exposed to direct user contact, because it is both

covered by or underneath the first portion of the enclosure and

because if the pad, the electrode were exposed, then it would

be detecting the cardiac signal based on contact with the pad

via the user's skin contact with the pad and not with the

enclosure.  So, you know, in that sense we didn't think that we

were importing a negative limitation, at least in the way the

Federal Circuit defines the term.  I mean, I get it, our

construction has the word "not" in it, but I think it's a

fairly straightforward applicant of the claim requirements.  It

isn't a situation where the claim language would otherwise

support a broader interpretation and we're trying to

specifically exclude something based on disclaimer.  It's just

that that's what our view is of the claim in its totality.

So let's just break this down a little more.

As counsel presented, there are really two aspects to our

construction.  One is that the pad is an electrode, and the

second is that it can't -- the electrode can't be exposed.

That the pad is an electrode is inherent in the functional

requirement that the pad be the component of a heart sensor

that detects the first electrical signal of the user's cardiac

signal.

So as Apple's expert said, Dr. Stoltz (phonetic) explained during the tech tutorial, a person of ordinary skill in the art would call these connection points that actually detect the electrical signals an electrode.  So the functionality disclosed in the express language of the claim simply defines what an electrode is to a person of ordinary skill in the art. Now, the word "pad" by itself probably doesn't have to be an electrode, but when the claimed pad has to detect the electrical signal of the user's cardiac signal and it has to be coupled to the connector to provide that signal to a processor, that by definition is an electrode.

And I don't think Apple actually ever argues in its briefing that the pad is not an electrode.  I -- nor could it. Its expert explained that that's what an electrode is.

This illustrates really the same thing.  The accepted definitions of an electrode is the portion of the lead that records the electrical activity transmitted throughout the body and can be picked up from the -- that can be picked up from the user's skin.

And that's why we asked for this construction, because the word "electrode" appears throughout the prosecution history, the prior art, AliveCor's documents, the parties' infringement contentions.  The slide is a little crazy, a little crowded. It's just offering a few examples from Apple's own description

1    of the claims in the infringement contentions.  You can also

2    see from Apple's excerpt here that, you know, AliveCor's

3    documents use the word "electrode."

4        And of course there's this universe of intrinsic evidence

5    where Apple distinguishes prior art based on the placement and

6    functionality of the first electrode.

7        **THE COURT:**  I assume it's not disputed that the

8    patent doesn't say electrode anywhere.

9        **MS. CLARK:**  Thanks is not disputed.

10       And so, and you might say, well, why is this important?

11   Why should I add the word "electrode" into the mix if the

12   patent doesn't say it?  Why not just leave the word "electrode"

13   out?  And I would say the reason is the jury needs some

14   guidance.  Because unlike Your Honor, the jury isn't going to

15   have seven pages of prosecution history where --

16       **THE COURT:**  But is that how claim construction works,

17   that I figure out what sort of things the jury might want for

18   perspective?  It's just that seems like a baseless argument.

19       **MS. CLARK:**  I think that in the absence of a

20   construction that lets the jury know that the pad as claimed

21   here is an electrode, that there is a real risk that Apple will

22   argue to the jury that the pad doesn't have to be an electrode,

23   and then you have a severe discrepancy between what the jury

24   finds based on its interpretation of the claims, right, which

25   is Your Honor's function, and the thousands of pages of

1  intrinsic record, which make very clear -- and we'll go through

2  them, because that will be fun -- make very clear that as used

3  here, the first pad is an electrode.  And to avoid that

4  discrepancy and to be consistent with the plain and ordinary

5  meaning of what Apple's own expert told us, right, the pad or

6  an electrode is, it's incumbent upon I think us to make sure

7  the jury understands that what the word "electrode" means in

8  the context of the claims.

9       All right.  So this is just an example -- I guess we're

10 going to get right into it -- of the very clear occurrence in

11 the intrinsic record where Apple affirmatively disclaims any

12 reading of Claim 1 as reading on an exposed electrode.  I think

13 while Apple doesn't ever come out and say that it disagrees

14 that the first pad is an electrode, it does argue that this

15 term is only used in the prosecution because that's how prior

16 art references describe the components in their inventions, but

17 I think that's exactly the point, right?

18      In the prosecution history, Apple used the term

19 "electrode" to distinguish its invention from the prior art.

20 That Apple identified electrodes in the prior art and then

21 distinguished them on the basis that they did not have the same

22 structural characteristics of the claimed first pad is exactly

23 what we're asking to clarify through this instruction.  So that

24 is Apple specified that an electrode cannot be under the first

25 portion of the enclosure and read on its claimed invention.

1   So this is a deep dive a little bit, but if you'll indulge

2 me, I actually think this portion of the prosecution history

3 that Apple cited in its reply brief and discussed before Your

4 Honor is actually particularly useful in defining the claim

5 scope.

6   So here you see Apple cites to exhibit 144-5 with its

7 quoted language from how Gilles' auxiliary electrode cannot be

8 equated to the first lead embedded in an enclosure of the

9 electronic device.  And you might be wondering, as I was, what

10 does it have to do with anything?  Because we are not trying to

11 equate the first lead with an electrode, and neither does

12 Apple, and quite frankly this claim language no longer appears

13 in the claim.  And that's because this quote from Apple's brief

14 actually comes from the claim as it was originally drafted,

15 without reference to the first pad at all.  It only referred to

16 an embedded lead.

17   But the examiner twice rejected the claim in view of

18 Gilles on the basis that the lead not only includes electrode

19 13, but also the other components of the lead, such as the

20 wire, such as the wire, maybe, such as other parts of the

21 electrode, like the wire that connects the electric tried to

22 the processor.  You know, that's shown here in Figure 8.

23   So because the lead, with all of its constituent parts,

24 included a portion, specifically the wire, that was embedded in

25 underneath the enclosure of the cover of that heart sensor

1    thing shown in the middle of that guy's chest, the examiner

2    rejected the claim twice, both in a final office action and in

3    an advisory opinion.  And so that argument that Apple has

4    quoted was superseded because the examiner didn't buy it.

5        So instead, what Apple did is it came back and amended its

6    claim to add the language relating to the first pad, and that's

7    what's shown on the left here.  Note that they also add the

8    clarifying language that the first pad has to be configured to

9    detect the first electrical signal of the user's cardiac signal

10   via the user's skin contact with the exterior surface of the

11   first portion enclosure.  So here you can see that Apple's very

12   clearly analogizing the pad to just the electrode 13 to

13   distinguish Gilles.

14       Apple first notes that the examiner attempted to equate

15   the wire connecting the electrode 13 to the case to the first

16   lead.  And then when that doesn't work it comes back and it

17   says, okay, so what we're gonna do is we're going to add this

18   first pad language such that the claim only now reads on

19   Gilles' electrode 13.  And Apple goes on to argue in the quoted

20   language that Gilles is distinct, because in Gilles the user's

21   cardiac signal is detected via the user's contact with the

22   electrode, which is clearly distinct from and not embedded in

23   the case.

24       So --

25            THE COURT:  But isn't this about "embedded?"  Why is

1    this even about "underneath?"

2         **MS. CLARK:** So this -- in this particular instance

3    two things, and primarily we're addressing whether or not the

4    pad and the electrode are the same thing.  But this does make

5    both aspects of AliveCor's proposal clear, right?  That is, the

6    first pad is an electrode specifically configured to detect the

7    electrical signal of the user's cardiac signal, just like

8    Gilles' electrode 13, and the key differentiating point between

9    the claim in Gilles is actually the second aspect of our

10   construction, right?  That is, it cannot be that the electrode

11   detects the user's cardiac signal via the user's contact with

12   the electrode.  It has to be via contact with the enclosure.

13   And that forecloses Apple's reading, which would allow the

14   electrode pad to be exposed to the user, because if that were

15   the case, then the electrode pad, by its nature of being

16   configured to detect an electrical signal of the user's cardiac

17   signal, would be detecting it based on contact with the

18   electrode.  And that's the specific configuration that Apple

19   distinguished in Gilles.

20        **THE COURT:** So your position is that when I review

21   all of that stuff you just said against the clear and

22   unambiguous disavowal standard, I should find that they've

23   effectively agreed that the pad could be an electrode?  What

24   is -- what is even the disavowal that you're arguing here, or

25   lexicography, whichever?

1           **MS. CLARK:**  So in this particular instance, the --

2     Apple specifically argued that the pad is the electrode 13,

3     right?  Should be limited to just the part that's touching the

4     skin, right, in Gilles.  And that part is not underneath or

5     embedded in, right, the cover.

6           And so what Apple did there, right, in order to get its

7     claim allowed, is it included the word "pad" so that its claim,

8     so that the requirement of "embedded in" and "underneath" would

9     be circumscribed just to the electrode structure.

10          I have more.

11          **THE COURT:**  What's that?

12          **MS. CLARK:**  I said, I have more if that doesn't

13    convince you.

14          So the remainder of the intrinsic record also supports

15    AliveCor's construction that the electrode required by Claim 1

16    has to be designed such that it's not exposed to direct user

17    contact.  So here this is the first direction.  The patentee

18    specifically argues that the electrodes of Ceballos cannot be

19    said to be positioned underneath the exterior surface of the

20    shroud, which is the enclosure, such that the electrode detects

21    the electrical signal of user's cardiac signal via contact with

22    the exterior surface of the shroud under which the electrode is

23    positioned, and it says, because there is an opening in the

24    shroud that exposes the electrode.

25          So Ceballos is exactly the picture that, in slide 10 that

1   Apple just came and showed you and said, no, now it's our

2   position that this should be allowed by the claim language

3   because there may be holes or it may be partially covered.  But

4   that's the opposite of what Apple argued during prosecution.

5   It said that where the enclosure is designed to allow the

6   electrode to show through, that's different.  Where the

7   electrode is, quote, accessible through the holes, that is --

8   fails to meet the dual limitations requiring that the pad be

9   underneath the enclosure and also that detecting the cardiac

10  signal be done via contact with the enclosure, not via contact

11  with the pad.

12      So again, this is literally the same design that Apple

13  showed you in slide 10, only during original prosecution, the

14  patentee said the exact opposite of what Apple's arguing now.

15      Gilles, we already discussed Gilles.  But here again, the

16  patentee is emphasizing that the user's cardiac signal is

17  detected via direct contact between the electrode and the

18  user's skin as a way of distinguishing the claimed invention,

19  meaning that where there is direct contact between the

20  electrode pad and the user's skin, that is not Apple's first

21  pad.

22      Same thing with Weiss, right?  Here again, Apple says the

23  applicant never distinguished Weiss based on the exposed

24  electrode pad, but I'd ask you to read the response to the

25  office action.  It's just not true.  The applicant clearly

1  points to the "first pad" language that we're discussing, which
2  requires that the first pad be embedded in the enclosure, that
3  it be underneath the exterior surface of the portion of the
4  enclosure, and it be capable of detecting the electric signal
5  of a user's cardiac signal, right?  That's how they
6  characterize their own claim.  So it's an electrode.
7      Then the applicant --
8          THE COURT:  I just don't understand what you're
9  saying.
10     All they're saying is whatever is described in the prior
11 art, it's not embedded, it's not underneath.  How is that a
12 concession or a, you know, a disavowal of any sort of pad
13 that's not an electrode?  I -- you can make your argument, I
14 get it, I just fundamentally wonder -- well, I know why you're
15 making the argument.  I know why you feel like you have to make
16 the argument.  This doesn't seem to me to be near the sort of
17 high standard for disavowal that the Federal Circuit has laid
18 out.
19         MS. CLARK:  Okay.  And, look, I know that there's
20 only a portion of the prosecution history here, but that's a
21 space issue, right?  The entirety of that paragraph, it is, I
22 think Apple quoted the first half, we quoted the second.  But,
23 so Apple quotes the language about the first pad being
24 underneath, and then literally uses the words "that is," right,
25 as in equating these, the limitation, to, right, Weiss'

electrode limitation, or electrode 12, it says, "that is."
Nowhere does Weiss show or support that any electrode 12 is
embedded in any portion of the case of the housing of the ECG
monitor or in any portion of the swing arm assembly, let alone
suggest any electrode 12 positioned underneath the exterior
surface of a portion of the case 14 or swing arm assembly.

So why would it have to be, right, that the electrode 12
be the thing that is either -- that is embedded in and
underneath, right, if it weren't for the fact that Apple itself
is equating the electrode to the pad?  Now, if we were just
saying, hey, any part of Weiss could be embedded in the case,
right, or underneath the case, then certainly there are
components within Weiss, just like there are components within
Gilles, right, that the examiner expressly found met the
"embedded in" and "underneath" claim limitation.  Remember that
was the whole wire discussion in Gilles.

And so if is because Apple equates the pad with the
electrode that it is able to get its claim allowed.  Had they
not done that their claim would still be rejected under Gilles,
because there's no dispute that there is some component, right,
some part of the lead that is, in fact, underneath and embedded
in an enclosure.

All right.  Well, that brings us to the IPRs.

Start with this quote, I think I already put it up, that,
you know, Apple corrected -- so Apple comes and says, well, all

1   we're doing here is really correcting AliveCor's mis-

2   characterization, that it never argued the first pad and first

3   portion of the enclosure could be met by the surface of an

4   exposed pad.  And again, that's really all we're asking to

5   carry through into the construction is let's just be

6   consistent, right?  If it's never been argued and Apple doesn't

7   maintain that the first pad and the first enclosure can be met

8   by the surface of an exposed pad or electrode, that should be

9   clear, and it seems like now they're arguing the opposite.

10       Here is Apple's reply brief, again, juxtaposing, right,

11  what it said against what it actually said in the PTAB.  And

12  the quote's close other than the fact that they ignore, right,

13  that before the PTAB, Apple characterized the claim as

14  requiring, quote, an electrode pad.  So Apple does in fact use

15  the word "electrode."  Not when it's characterizing AliveCor's

16  arguments, not when it's characterizing the prior art.  Apple

17  agreed in the IPR and again, right, in its reply brief that the

18  claim can't be met by the surface of an exposed pad, because

19  that pad has to be both embedded in and positioned underneath

20  the first portion of the enclosure, and it has to be capable of

21  sensing electrical signals -- so it's an electrode -- via

22  contact with the enclosure, right, not via direct contact.

23       So all together, if we look at what Apple has said, the

24  first pad has to be an electrode and it can't be exposed,

25  right, because it has to be underneath and embedded in the

enclosure, and the user has to make contact with the enclosure.
Here again I think is another clear example to rebut, right,
Apple's argument that it's never expressly characterized its
claims this way, it's just distinguishing prior art, but we
have Apple saying that underneath is the alternative to an
electrode that is, quote, at the surface of the enclosure.

So again, this is Apple arguing here to the PTAB that the
first claimed pad offers an alternative that is different from
an electrode exposed to the surface and not covered by the
first portion of the enclosure.  I think there is a fun quote
here.  He calls it the tip of the spear of his limitation.  You
know, fundamentally that is what Apple essentially told the
PTAB its claim was about, right?

Same thing here.  Apple -- as Apple's counsel told you,
AliveCor presented two grounds during the IPR, Markel alone and
Markel with Messella (phonetic).  To both Apple argued that
because they disclosed exposed or external electrodes -- and,
you know, that's a word choice.  If you like "external" better,
we're okay with it.  Exposed or external electrodes that they
could not read on the claimed first pad because they are not
underneath the enclosure and what is underneath the enclosure,
and because they detect the cardiac signal via direct contact.

So Apple clearly disclaims a structure where the first pad
is on the exterior of the device and in direct contact with the
user's skin.  Apple can't now come back and say, well, a

1    portion of the first pad can be exposed, or you can touch some

2    of it, because Apple already told us that the plain language of

3    the requirement of the claim requires that the electrode be

4    embedded and underneath the enclosure, that forecloses, quote,

5    external electrodes positioned for direct contact with the

6    user's skin.  I don't know how much clearer that can get.

7        Other than the dispute -- so I think we've addressed the

8    substance.  The other arguments are not super substantive,

9    right?

10       First, Apple says that we're asking for a negative

11   limitation.  Federal Circuit law, *Omega Engineering*, *Santarus*,

12   they all stand for the same thing, right, which is that a

13   negative limitation, it's not per se improper.  It has to be

14   supported by the words of the claim, or there has to be an

15   express claimer or independent lexicography in the intrinsic

16   record.  Here I think we've shown both, that the plain language

17   of the claim as a whole and the intrinsic record clearly

18   support the requested construction.

19       Also, you know, it's kind of just word choice.  So the

20   parties have presented the dispute for the Court, do the

21   requirements of the claim require that the enclosure cover the

22   electrode or not?  That's the dispute over claim scope that

23   we're asking you to decide.  And I think you asked earlier

24   could you just decide that based on, you know, plain language

25   or say no further construction necessary, but clarifying your

1    finding that the enclosure, the first portion of the enclosure

2    does have to completely cover the pad or electrode to prevent

3    user contact.  And I would agree with Your Honor that that

4    would resolve much of the substantive dispute.

5        We would ask respectfully for the remainder of our

6    construction equating the pad to the electrode, once again,

7    because we think that that is the plain and ordinary meaning.

8    We also think that Apple specifically added that language so

9    that its claim would be limited to the pad being an electrode,

10   so, and clearly characterized its pad as an electrode in the

11   IPR proceedings.  And we think that language is important,

12   because that is what a person of ordinary skill in the art

13   would understand the pad to be.

14       Apple's next argument about reading out embodiments.  I

15   mean, look, nothing in the law actually require that all claims

16   read on all embodiments.  That's particularly true.

17            **THE COURT:**  I get it.

18        **MS. CLARK:**  Yeah.

19            **THE COURT:**  I get the law, and I will read the cases

20   the parties have cited on that.

21        **MS. CLARK:**  Right.

22       I mean, counsel cites a number of examples, right, I guess

23   first starting with the abstract.  And I would just point out

24   here this kind of fits the classic example where there is no

25   reading out of an embodiment, right, because the embodiments

1    are intentionally drafted to be in the alternative, right?  It

2    clearly sets forth that the lead or the pad could be on the

3    interior or the exterior.

4        I actually like counsel's quote from column 6, 29 through

5    33, even better.  I wish I had put that on the slide.  It makes

6    very clear, right, that the lead or pad can include -- the lead

7    can include a pad or extended area placed on the outer or inner

8    surface of the electronic device, bezel or housing, right?  It

9    would be nonsensical to say that every single claim has to read

10   on every single embodiment when the embodiments are clearly

11   articulated in the alternative, right?  So it says it can be on

12   the interior or the exterior.  It can't be reading out a

13   specified -- an embodiment if, right -- it cannot be that every

14   claim has to be both interior and exterior, right?

15       Moreover, I mean, Apple is wrong that AliveCor's

16   construction reads out a preferred embodiment; it doesn't.  So

17   Claim 1 clearly states that there's two pads, right?  One can

18   be exposed to direct contact with the user's skin if that's the

19   design preference.  The fact that one of the claim elements

20   requires that the electrode be covered by the enclosure and

21   doesn't allow direct contact doesn't mean that the claim

22   under -- under the law, it doesn't mean that the

23   specification -- the embodiment is being read out.  It's just

24   being read on a different part of the claim, right?

25       There's -- counsel makes a big deal out of saying, well,

1    there's no limitation here that says the second pad.  There is

2    nothing in this specification that says second pad and what the

3    second pad requires at all, but it certainly doesn't say that

4    both pads have to be designed in the same way, and that would

5    be inconsistent with the plain language of the claims.

6        So here I would say the '257 patent very clearly offers

7    embodiments and designs that are in the alternative, and those

8    alternatives are reflected in the asserted claims.  For

9    example, there is Claim 15, which was not asserted, that would

10   clearly include an exposed lead or an exposed electrode design,

11   exposed pad, and there's -- or at least not foreclose it.  And

12   there's no reason that every single claim needs to include

13   every single embodiment.  Clearly there are claims.  Apple

14   knows how to draft claims that cover an embodiment where there

15   is an exposed electrode or exposed pad, it just simply chose

16   not to do so in claim one.  And again, that's okay.  That's the

17   patentee's right, and that's not reading out an embodiment,

18   because there are other claims that cover it.

19       If you have any questions?

20            **THE COURT:**  I don't.

21            **MS. CLARK:**  Thank you.

22            **THE COURT:**  Thanks.

23       All right.  So we're a little behind already in terms of

24   the time estimate, so let's see if we can stick to the time

25   estimate.

```
 1         MR. DE VRIES:  Yes, Your Honor, we absolutely will,

 2   and I -- I'm happy to address any aspect of their argument if

 3   it would be helpful for Your Honor.  Otherwise, I'm prepared to

 4   move on to the next term.

 5         THE COURT:  We can move on.

 6         MR. DE VRIES:  Okay.  Thank you.

 7      Okay.  Let me just get my slides up, Your Honor.

 8      All right.  So I'd like to now talk about "embedded in" in

 9   the '257 patent, and let me begin with Your Honor's questions.

10      Question 1 is is our proposed construction here different

11   than in the IPR.  The answer is "no."  It is the same.  It is

12   also the same as the construction that was adopted by the PTAB

13   in the IPR.  And then question 2 is, do we believe that there

14   was a disavowal either in the IPR, you know, or at anyplace,

15   and the answer is "no."  We believe that they -- AliveCor is

16   making that argument, and we disagree with it.

17      All right.  So the term is "embedded in," and the

18   construction that AliveCor is proposing has really morphed over

19   time and ours has stayed the same.  As I mentioned, plain and

20   ordinary meaning is what we think applies, but the construction

21   that we discussed in the IPR and that was adopted by the PTAB,

22   which is at least partially set in or partially surrounded by a

23   material we think is clearly correct under the intrinsic record

24   and that there's been no disavowal to change it.

25      AliveCor's construction has changed from the IPR, to what
```

1   we understood the construction was before the original

2   briefing, to what in their response brief they said.  In a

3   nutshell at the IPR context, AliveCor said this was a very

4   broad term, "embedded in," and only excluded, I'm paraphrasing,

5   but remote pads.  I think they use the word "electrode".

6          Then before the briefing started they had proposed the

7   terms that are in their proposed construction, which hasn't

8   changed, enclosed within a separate and distinct surrounding

9   material.  We had understood that to mean, them to intend that

10  to mean fully enclosed or fully surrounded by surrounding

11  material.  That's clearly wrong, because there's embodiment

12  after embodiment in the patent that shows exactly that, an

13  embedded object that is exposed.

14         And then in the response brief I think we got a pretty

15  clear statement that they are not taking that position, that

16  they understand that some portion of the embedded object can be

17  exposed.  But now they're arguing for two requirements, one

18  that there be direct contact between the embedded object and

19  the surrounding material, and that the material, those

20  materials of the embedded object and the surrounding material

21  be distinct, and those are clearly wrong, again, under well-

22  understood claim construction law.

23             THE COURT:  But is that somehow different than what

24  they presented in their brief?

25             MR. DE VRIES:  No, it's not, Your Honor.  That is the

1    same as what is in their response brief.  I just wanted to

2    orient Your Honor as to why were we positioning this issue the

3    way that we were in our opening brief, and it's because we

4    thought the dispute was about whether there was a requirement

5    in the claim for a complete enclosure or complete surrounding.

6    When we read their response brief they explained their position

7    and said, no, what we're saying is that there needs to be

8    direct contact or touching, one, and that there be -- that the

9    material be distinct, two.  And we address that in our reply

10   brief.

11           **THE COURT:**  Well, and the separate and distinct

12   surrounding material part is within their proposed

13   construction, but "enclosed," has -- I guess they'll have to

14   answer it.  Has their view of what "enclosed" means changed

15   somewhere here?

16           **MR. DE VRIES:**  It at least has from our

17   understanding.

18       I think in the response brief, like I said, I think

19   they're clear that they explain that they acknowledge that they

20   say at least one side of the embedded object can be exposed,

21   and then they say the other sides of the embedded object are

22   not exposed.  So I think that that, if I'm understanding that

23   correctly, that takes care of our concern that they were going

24   to interpret or mean "enclosed" to require completely

25   surrounding, but there are these two remaining disputes, which

is, does -- is direct touching required, and then do the
materials have to be distinct.

    Does that answer your question, Your Honor?

        **THE COURT:**  It does as much as you can.  I think it's
really a question for them.

        **MR. DE VRIES:**  Yes, Your Honor.

    Okay.  So let me start with the claim language.  The claim
language is simply "embedded in."  And there's no reference to
direct contact or touching, and there's no reference to what
the -- whether the materials have to be distinct or not in the
claim language.  And as I said, and I'll be brief here because
I know Your Honor is familiar with this, the patent clearly
discloses, like in Figure 4A as I'm showing here, that
describes an embedded lead, and that lead is exposed, as is
described in column 9 and shown in Figure 4A, and that supports
our construction, which is partially set in or surrounded by a
material.

    If you look at 4B, the patent also describes this figure
as showing a embedded lead.  So here, 472.  And again, what's
shown in this figure, which the patent says is embedded, is
partially set in or surrounded by here there's a curvature of
the material.  And so that's another example of -- in the
patent that supports our construction.

    Figure 3, which, you know, is also in the patent, it also
describes an embedded lead, here it's 322 and 324, that are

1    exposed and that are at least partially set in or surrounded by

2    the enclosure that they are embedded in.  So that all is

3    consistent with and supports our construction.

4         One other thing I'll say is that this got a lot of

5    discussion in the IPR.  The patent distinguishes between

6    "embedded in" on the one hand and "adjacent to a parallel

7    surface" in describing what embedded means.  In the IPR you'll

8    see a lot of discussion from Apple's expert, both on the Masimo

9    IPR and also the AliveCor IPR about that distinction, and what

10   that ultimately led to in the context of the Masimo IPR was the

11   PTAB adopting exactly the same construction that we're

12   proposing to Your Honor.  And they explain that the '257 patent

13   supports this construction in several ways, and they go through

14   the exact same evidence that I'm describing here.

15        Just Your Honor may fully recall this already.  This term

16   was not construed in the AliveCor IPR.  "Embedded in" was,

17   because the prior art was different.

18             **THE COURT:**  I see.  So no one in the AliveCor IPR, no

19   one asked for a construction?

20             **MR. DE VRIES:**  I believe it was identified for

21   potential construction, and I'm confident of that.  And then

22   the PTAB concluded it was not necessary to make its decision.

23             **THE COURT:**  I see.

24             **MR. DE VRIES:**  And I'll be brief here, but our

25   destruction -- and this was also discussed in the IPR -- is

1    supported by the extrinsic evidence.

2        So what is it that AliveCor is doing?  As I mentioned,

3    it's changed its construction even though the standards are the

4    same, you know.  And so in the IPR, that's shown on the left

5    what AliveCor says "embedded in" should mean is, simply entails

6    inclusion within a larger entity, and it says, the broad claim

7    language was intended to exclude only electrode pads that are

8    remotely coupled via wires.  So they --

9        And then by the time we get to the response brief, we have

10   AliveCor explaining that its construction means that the term

11   "embedded in" requires that the embedded component, the lead

12   pad, be enclosed in, i.e touching the separate and distinct

13   surrounding material, the enclosure.  And so we see in that

14   description of their construction, assuming they have move on

15   from this idea that their construction requires full or

16   complete surrounding, that there be direct contact or touching

17   between the embedded component and the surrounding material and

18   that the materials must be distinct.

19       Those proposed additions to the claim, those two

20   requirements, are wrong.  They're not included in the claim

21   language, and they're not even included in their own

22   construction.  So this is sort of a construction of a

23   construction.  But most importantly, it is 100 percent and

24   definitively contradicted by what the specification describes.

25       So what I'm showing Your Honor is column 9, lines 26 to

1    35.   And it's talk about that Figure 4A, where you had an

2    embedded lead that was exposed on the corner of the bezel, and

3    it says that in some embodiments, electronic device 400 can in

4    addition include an isolating layer positioned between the lead

5    and the bezel.  So they -- the patent specifically says there

6    can be an isolating layer between the embedded lead and the

7    bezel that it's embedded in, and it gives examples:  Ceramic

8    material, plastic, rubber, any other suitable material.

9         And so the request that Your Honor have a direct contact

10   or touching requirement directly contradicts this disclosure.

11   And there is no argument that, well, maybe some other different

12   claims are gathering this.  This is talking about embedded.

13   Everyone agrees that this is a disclosure of what is discussed

14   in Claim 1, and it says there can be a layer between the

15   things, that there is no direct contact or touching

16   requirement.

17        And there's an argument that they make sort of briefly

18   that the title somehow means that direct contact or touching is

19   required because it uses the word "seamlessly".  That's wrong.

20   "Seamlessly" is used in the patent very broadly to just talk

21   about in this portion of column 2, lines 7 to 13, "seamlessly

22   integrated cardiac sensor," and then it says the cardiac sensor

23   can be integrated in any suitable portion of the electronic

24   device, and it's discussing this broadly.  Nothing about that

25   use of the word "seamlessly" would justify what AliveCor is

1    suggesting, which is that that means that the relationship

2    between "embedded object" and the material has to be without

3    breaks or gaps.  And again, that would be totally inconsistent

4    with the specification that says you can put an isolating

5    material between those.  And so the request that Your Honor

6    require direct contact or touching is just wrong under the

7    patent.

8        It's also wrong under the extrinsic evidence that they

9    talk about in their brief.  So they -- this is part of their

10   content to construe the construction.  They talk about

11   definitions of the word "enclose" or "enclosed," and in all of

12   those definitions there's nothing that says touching or direct

13   contact is required.  And so just like in the intrinsic

14   evidence, the extrinsic evidence is the same, and we think it's

15   very clear that adding a direct contact or touching requirement

16   would be wrong.

17       So then the second thing that they argue is that the

18   material needs to be distinct between the embedded material and

19   the surrounding material.  That's also wrong.  I'm showing Your

20   Honor some portions of the spec at column 2, lines 51 to 59,

21   and column 9, 26 to 35.  And it's again talking about that

22   isolating layer or isolating component.

23       In the first disclosure at the top, it says the reason

24   that you might do that is to prevent shorts between the leads

25   that are there.  And what you hear in column 9 is that that

1    isolating layer can be necessary when both the lead and -- the

2    embedded lead and also the enclosure are made of conductive

3    material.  And so because they're both conductive, it says, if

4    you like you can put an isolating layer between them, and

5    that's to avoid shorts.  And what that -- and then it says, but

6    you don't have to do it.  Alternatively, if the material of

7    bezel 410 is not conductive, and then I'm skipping, no

8    isolating layer may be necessary.

9        So the patent totally contemplates a configuration where

10   the surrounding material is not distinct from the embedded

11   material.  In fact, it directly contemplates a situation where

12   it is.  And so what's really going on here -- I'm not going to

13   read Your Honor this law -- is a prosecution disclaimer

14   argument.  And in particular, there are some statements that

15   were made in the IPR that AliveCor's using to support this part

16   of its construction, and they're really some of the same

17   statements that we looked at with respect to the earlier

18   discussion where Apple was explaining that the first pad and

19   the first portion of the enclosure are two distinct components.

20   They're not the same thing.

21       This was that statement that was discussed in connection

22   with the underneath, where Apple was not saying you could never

23   have an exposed pad that was -- that would satisfy either of

24   these limitations.  It was saying that the first pad and the

25   enclosure are two distinct components.  It was never saying

that the material in those components had to be distinct, and
you won't see anything in the disclosure that says that.

And then there is an argument that the PTAB's holding was
somehow supporting the construction that AliveCor is proposing
here.  And they point to a portion of the AliveCor IPR final
written decision to support that with Markel, but that's
talking about a different claim limitation, the underneath
limitation as I've shown in blue, not the embedded in
limitation, and --

**THE COURT:**  So in your view, did the PTAB say
anything about this embedded meaning in its decision?

**MR. DE VRIES:**  So the PTAB in its AliveCor IPR, as
contrasted from the Masimo IPR final written decision
ultimately determines that the Markel disclosure doesn't
satisfy the underneath requirement.  There is some incidental
discussion of embedded in in the final written decision, but
nothing that would support a direct touching requirement, a
full enclosure requirement or a distinct material requirement.

And then lastly, Your Honor, there's the discussion of the
file history.  And this is -- it may be Gilles, and so I had
said Giles.  I'll adopt Gilles.  I'm not sure which it is.  But
this is the prior art reference that actually also came up in
our discussion about the underneath element, and I pointed out
this wasn't a discussion of underneath, this was a discussion
of embedded in, and you can see that here.

1        But what -- in terms of the actual words of the

2   construction that AliveCor's asking Your Honor to adopt, they

3   say it comes directly from this discussion, this concept of

4   enclosed, and it's based on just an obvious misreading of this

5   disclosure.  And so they try to say that what the applicant is

6   saying here is that embedded in requires enclosed within.

7   That's their argument.  And they even take this and put in

8   the -- that sic symbol, like, you know, paren sic, end paren,

9   between the word "Gilles" and "display."  I've never been able

10  to understand what that's intended to mean, but what this is

11  talking about here is that the electrode that was being

12  described in Gilles, there was no suggestion that it was

13  embedded in the case, let alone embedded in the display as

14  enclosed within the case.  And what it's talking about is the

15  display being enclosed within the case, not redefining embedded

16  in to require enclosed within.  And so the language of this

17  prosecution history that they say that their construction comes

18  from does not support it.

19       Your Honor, unless you have any other questions, I'm

20  complete.

21            **THE COURT:**  I don't.  Thanks.

22            **MR. DE VRIES:**  Thank you.

23            **MR. STEVENS:**  Good morning again, Your Honor.  Scott

24  Stevens from Alston & Bird on behalf of AliveCor, and I will

25  address the "embedded in" term.

1          Let me start with the two questions that you asked us to

2     address.  First off, are we offering a construction that is

3     different than the IPR?  In the sense that in both proceedings

4     we've said that we believe the plain and ordinary meaning

5     controls, that's the same.  The words that we chose to describe

6     that in the IPR were that it "entails inclusion within a larger

7     entity," which are different words than we're proposing here

8     but we think conceptually get to the same point.  So we think

9     it's plain and ordinary, and we think just the sort of common

10    American English denotation of "embedded" controls here.  So

11    that's your first question.

12         The second question is, are we relying upon any sort of a

13    disavowal.  The answer to this is, "no," we're not relying upon

14    a disavowal.  We think that "embedded in" deserves its full

15    ordinary parlance as that term is used.

16         What we think is going on here, we are not trying to slice

17    away or take a subset of the full use of the word "embedded."

18    What we think is going on here is that Apple is trying to

19    broaden the word "embedded" to encompasses something within its

20    ambit that is not used in the ordinary course of what's

21    embedded.

22         And so I'm going to get to the intrinsic record, but what

23    I'd like to do is try to frame the dispute for Your Honor and

24    what the real dispute is between the parties.

25              THE COURT:  Everything you just said, ultimately what

1    use are you making of the intrinsic record if not to say that

2    they're somehow bound to it, and they gave something up or

3    committed to a view that is consistent with your plain and

4    ordinary meaning construction, basically?  It seems a little

5    dodgy to say that you're not relying on the intrinsic record to

6    amount to a disavowal.

7              **MR. STEVENS:**  I don't think there's a disavowal at

8    all.  I do think the intrinsic record is inconsistent with the

9    broader interpretation that they're trying to seek here.

10        So where the rubber meets the road in our eyes is the

11   inclusion of this "partially surrounded by a material" in their

12   construction.  That is not the plain and ordinary meaning of

13   embedded.  The intrinsic record helps identify that that is

14   something different than embedded, and their own statements

15   from their experts are inconsistent with their construction.

16   So I don't think there's been a disavowal.  I actually think

17   this is an attempt at a land grab from Apple to actually get

18   rid of the word "embedded" and exchange that with something

19   that's inherently a broader concept.

20        We are happy telling the jury, hey, use your common sense

21   on what the word "embedded" means, but Apple doesn't want to do

22   that.  Apple wants to take those words away and say that it is

23   anything that is partially set in -- the set in part doesn't

24   trouble me as much -- or partially surrounded by a material

25   isn't inherently embedded.  Let me sort of contextualize what

that means.

In Apple's construction, I, standing right here at this podium, I am embedded in the walls of this courtroom because they partially surround me.  I don't think if you asked a hundred people on the street whether that's the definition of "embedded," I don't think people would embrace that.

And so to put it a little bit closer to the context of what you're going to hear in this case, I have a glass bowl in my left hand and I have a marble in my right hand.  I'm just going to put the marble in the bowl.  It's free to move around.  Under Apple's construction that marble is now embedded within this bowl, despite the fact that I can move it around, I can turn it over and pour it out right on my paper.  That's not the plain and ordinary meaning of "embedded".

So what Apple's trying to do here is get the Court to embrace something that is actually broader than that -- than that phrase is actually used in the English language, to grab not only what we would actually think of as being embedded, and to take something that says partially surrounded by becomes embedded.  Again --

THE COURT:  But I -- you know, Counsel, again, I just, I -- on your responsive brief I wrote, because you -- counsel is right.  You said:  AliveCor contends that the phrase "embedded in" requires direct contact with the surrounding material, but that's not in your proposed construction.  You're

1    just making this muddy and murky.  Like why, why, if that was

2    the issue, would you not have put that in your proposed plain

3    and ordinary meaning interpretation?  I'm just not

4    understanding how that shifts from the time that you propose

5    your construction.  I understand it's a plain and ordinary

6    meaning construction or definition, but I'm confused as to what

7    you're actually seeking at this point.

8             MR. STEVENS:  If I can put it as bluntly as possible,

9    what I'm seeking is for the Court not to embrace the notion

10   that a partial surrounding is the equivalent or the same or

11   within the ambit of the definition of "embedded."  That's what

12   I'm asking the Court to do, not fully embrace that.  I am not

13   embedded in the wall of this room.  I don't think anyone would

14   think that.

15            THE COURT:  Whatever, Counsel.  I mean, why don't you

16   just keep going.

17            MR. STEVENS:  Okay.  And that's really what we're

18   getting at, right?  The notion of being partially surrounded is

19   a different denotation in the English language than something

20   that's embedded in something else.  Those are just two

21   different things.

22        So whether our language is the absolute perfect way of

23   reducing this to writing, maybe it is, maybe it isn't, but the

24   notion of adding -- "embedded" means something that's set into

25   something else, or just all it has to be is partially

surrounded by, that's the part where they're not just taking

the plain and ordinary meaning.  They're trying to take

something that is a broader concept than what the words, the

denotation of the claims allow for.  So you if don't --

THE COURT:  I always take it in these cases that all

either of you is doing is your level best to advance the

position that is best for your client.

MR. STEVENS:  Well, that's -- sure, that's table

stakes.  We both are.  But what they want to do is have Your

Honor tell the jury that something can be embedded by -- in

something else if it is merely partially surrounded by that

something else.  That's what they want you to tell the jury.

And then they're gonna say, okay, well, that's all it takes to

be embedded, so we don't have to look and see whether it's

actually partially set into something else like one would

actually think the word "embedded" means, and instead, if it's

partially surrounded by it, boom, that's enough.  And that's

the part that we do not want the Court to do, respectfully.

If the Court wants to just say it's plain and ordinary

meaning and tell the jury, hey, this is a regular word, this

isn't a complex or technology-laden word.  The notion of

something being embedded in something else, we've all

encountered that in our daily life.  You know, the jury can

figure it out.  But if we tell them officially the Court has

approved the notion that being partially surrounded is within

1  the ambit of that definition, that now changes the scope of the

2  claim broader than it's actually written.

3           **THE COURT:**  So your PTAB construction was the plain

4  and ordinary meaning is inclusion within a larger entity.

5           **MR. STEVENS:**  Yes, sir.

6           **THE COURT:**  Is that different than what you're

7  arguing for now?

8           **MR. STEVENS:**  The words are different, but we don't

9  think conceptually it's different.  If you like --

10          **THE COURT:**  And why not?  Why is that not, you know,

11 conceptually or otherwise inconsistent with your current

12 position?

13          **MR. STEVENS:**  I mean, our position of you embed one

14 thing in another.  If I take my marble analogy and I were to

15 heat the glass and make the marble a part of the glass, then

16 I've embedded it in this bowl, right?  It has to be you take

17 one thing and you embed it in something else.  For example,

18 take a golf ball in a sand trap, right?  The golf ball gets

19 embedded into the sand.  It's not entirely covered, but it is

20 now in the sand and has to be hit out.  It's not just sitting

21 on the surface of the sand.

22     That's what we're trying to do here.

23          **THE COURT:**  So I think the best use of our time would

24 be not to continue to talk about, you know, the, you know,

25 logic of your position and the abstract, any of those things.

1     Let's go to the record and you make your pitch based on that.

2          **MR. STEVENS:**  Okay.  I'm happy to do that.

3          So you saw this figure.  This is one of the things the

4     patent talks about with the integrated cardiac sensor.  Okay?

5     And then you see in the claim, we now see the word "embedded

6     in" twice.  So the first lead comprises a first pad that is

7     embedded in a first portion of the enclosure, and then

8     similarly, the second lead has a second pad that's embedded in

9     the second portion.  So we see the pad has to be embedded in

10    the enclosure.

11         Now, the patent does show examples of where things are

12    embedded and where things aren't embedded.  My friends at the

13    other table came up and said 4A is an example that the patent

14    says where the lead or the pad is embedded within the bezel.  I

15    agree with that.  We see that right there in 4A.  Now, it

16    doesn't meet the claim because it's not underneath, but let's

17    put that aside.  But 4A shows the lead or the pad embedded.  It

18    is in, it is literally in a pocket in the bezel.

19         Now, 4B, though, is where I'm going to part ways with

20    opposing counsel.  4B does not show, as it sits right here, it

21    does not show an embedded sensor.  It shows a sensor that can

22    be positioned against the back surface of the bezel.  So I'm

23    reading now from line 43 and 44.  It says:  Lead 472, as we see

24    4B, of the heart sensor can be positioned against the back

25    surface of the bezel.  So here's an example where it's not

1  embedded.  Patent says you can do it either way.  You can put

2  it up against, adjacent to, or you can embed it.

3      Now, after describing 4B, where the lead is simply put to

4  the back of the bezel, after describing that, the patent goes

5  on in the underlying language starting at line 45 to say

6  alternatively.  Okay.  So different than what we've just seen,

7  where it's just on the back, it just abuts it on the back.

8  Different than that, the lead can be placed within the

9  thickness of bezel 460.  For example, in a pocket within the

10  bezel wall, but underneath the outer surface of the bezel.  And

11  that's how you would embed it.  I annotated it here.

12      And so if you move the lead into the bezel, now it would

13  be embedded.  So what we see on the screen now is an example of

14  how you would actually embed it underneath the bezel just as

15  the patent is telling us.

16      Now, the patent is very clear that these are two distinct

17  concepts, the notion of something embedded in something else,

18  versus merely adjacent to something else.  The patent tells us

19  this explicitly in column 10.  As it says on the screen, one or

20  more leads can be embedded in or adjacent to the housing.  Two

21  different concepts.  You can embed it in like we saw, where

22  it's in a pocket in the other material.  That's what embedded

23  means.  Or it could be just merely next to it, on the back side

24  of it or adjacent to.  Those are two different concepts.  And

25  that's consistent with what we've seen in the intrinsic record.

1      So here there was a question about whether figure

2  numeral 7 at the bottom in Gilles was embedded within number 9

3  or number 3 above it, and they're not.  Apple has said, no,

4  nowhere does Gilles show or suggest any electrode embedded in

5  any portion of the case 3 or the auxiliary device 9.  They're

6  just merely abutting one another.  This is an example of

7  abutting, not being embedded in, and I completely agree with

8  that.

9      So Apple goes on to talk about these being two distinct

10  components.  You saw this a moment ago.

11      Now, here's where Apple first talks about its

12  construction, right?  It says that embedded in requires more

13  than two materials or substrates.  The notion of embedded in

14  requires more than two materials or substrates that are merely

15  positioned adjacent to, parallel or against each other.  So

16  that much there's no daylight between us and Apple.  We agree

17  with that.  Embedded in cannot just be adjacent to, parallel or

18  against.  Those can't be.

19      All right.  Fine.  Nobody's disputing that.

20      But then Apple says it requires this -- it introduces this

21  concept of being partially surrounded and says you can even be

22  surrounded by something that doesn't touch you.  Again, that's

23  me in this courtroom being embedded into the wall.  That is not

24  what embedded means.  I am not standing here embedded in the

25  wall.

1          Now, that's what Apple's lawyers said, but if you look at

2     what Apple's expert said, it's a little bit different.  The

3     expert, they don't adopt this notion of partial surrounding

4     being within the concept of embedded.  This is Dr. King.  This

5     is Apple's expert.  Apple says -- Apple's expert says:  The

6     term "embedded means," quote, that which has been incorporated

7     into a surrounding mass or enclosure, end quote.  And then he

8     agrees that it requires more than mere positioned, adjacent to,

9     parallel or against one another.  I agree with this

10    wholeheartedly, that which has been incorporated into a

11    surrounding mass or enclosure.  I completely agree with

12    Dr. King's statement there.  That is just the plain and

13    ordinary meaning of embedded.  It does not embrace this

14    additional notion of either that or something that's partially

15    surrounded by.

16         Apple goes on to say:  The definitions of "embed,"

17    reciting, quote, to enclose closely in, or as if in a matrix,

18    or, quote, to making something an integral part of and, quote,

19    to envelop or enclose all indicate that for a first component

20    to be embedded in a second component, the first component must

21    be at least partially set in or partially surrounded by the

22    second component.

23         I agree with the first half of what Apple's saying.  Those

24    three statements, which are just the plain meaning of the word

25    "embed," to enclose closely in or as a part of a matrix, I have

1    no problem with that.  To making some an integral part of,

2    that's what embed means.  No problem with that.  And to envelop

3    or enclose, no problem with that either.  I agree with Apple.

4    That is, those are the plain and ordinary meanings of "embed".

5         The logical gap is where Apple says all of that counts,

6    but also this notion of partial surrounding.  That's not what

7    any of these -- first off, that's not what the patent says it

8    means, it's not what their own expert says it means, and it's

9    not what the dictionary definitions that they've cited to.

10        Again this is their own expert saying it means that which

11   has been incorporated into a surrounding mass or enclosure.  He

12   doesn't adopt the notion of partial surrounding.  There's no

13   point in time where Apple's expert says that's right.  He knows

14   it's not right.  It's not -- that's inconsistent.

15        So, again, the context here, this apple in the bowl, is it

16   embedded in the bowl?  No, I've just put it in the bowl.

17             **THE COURT:**  Counsel, gosh.

18             **MR. STEVENS:**  If you don't like the analogy, I'll --

19             **THE COURT:**  I don't.

20             **MR. STEVENS:**  Okay.  That's fair.

21             **THE COURT:**  I don't find it useful.

22             **MR. STEVENS:**  That's fine.

23        So at any rate, again, I want you to understand that our

24   position is that what they're trying to do is inconsistent with

25   the ambit of the language.  It's trying to actually broaden the

1    notion of "embed."  We're happy with the full plain and

2    ordinary meaning as the English language, you know, dictates it

3    should have.  But if the Court were to say it also includes

4    that, plus being partially surrounded by, that is now expanding

5    the claim.

6        Now, much as you saw with the last term, there is an

7    accusation that we're reading out embodiments.  I'm sure

8    Mr. De Vries is not going to get up here and suggest that the

9    law requires every claim to cover every embodiment.  I'm sure

10   he's not going to say that.  But as I mentioned, there is

11   specific disclosure of exactly this concept.  4A shows us an

12   embedded, an embedded lead, which is entirely consistent with

13   what we say it has to be, embedded into something else.  That's

14   what it shows.

15       4B, as the patent shows it, is not embedded, but then it

16   says, alternatively it can be placed within the thickness of

17   the bezel as an alternative to being behind it.

18           **THE COURT:**  So what is your response?  Opposing

19   counsel pointed to column 9 where 4A is discussed.  There it

20   does say that 4A is embed -- it shows an embedded configuration

21   and says:  In some embodiments, electronic device can in

22   addition include an isolating layer positioned between lead and

23   bezel.  And they're arguing that that cuts against your

24   apparent claim that direct contact is required.  What's your

25   response?

1          **MR. STEVENS:**  So I have two responses.

2      First off, the patent never explicitly tells us that it

3  would still be embedded in the bezel as opposed to embedded in

4  the isolating layer.  That never says that explicitly, but I

5  think that's beside the point.  If there were some sort of

6  device between the two that sort of held its positioning, it's

7  still embedded in something else.  So this notion that that

8  somehow takes or cuts against our construction, I don't agree

9  with that whatsoever.  If I were to embed one material into

10  another and there's a little piece of rubber to help its

11  placement, you know, that is still embedding it in there.

12          **THE COURT:**  Let's try to do it this way so that I

13  understand what you're proposing.

14          **MR. STEVENS:**  Okay.

15          **THE COURT:**  Your plain and ordinary meaning

16  construction or proposal in your brief or in your initial

17  statement and in your actual proposed construction doesn't seem

18  to incorporate this direct contact idea, so just tell me what

19  your proposed construction is in full so I can understand it.

20          **MR. STEVENS:**  It's as we've offered it.  It's

21  enclosed within a separate and distinct surrounding material.

22  And when we say "enclosed within," that means it's enclosed

23  within the other material.  By definition that is touching it,

24  right?

25      So again -- well, I don't want to give you an analogy,

but, so "enclosed within," it has to be within the confines of

the other material.  It does not have to be fully enclosed.

I'm not suggesting and we're not suggesting that in order to be

embedded, something must be truly 360 degrees, you know,

completely encompassed by the other material, but it needs to

be at least partially enclosed within that other material.

So we stick with the construction as we've offered it to

Your Honor.

**THE COURT:**  But how would the jury understand that

that's the direction they're getting as to plain and ordinary

meaning?  If I go that direction, if this direct contact idea

is something that you're saying, and by that we mean, see,

that's what I'm saying, if I'm giving the construction, then

I'm giving the construction.

**MR. STEVENS:**  I understand.

We think the word "within" takes care of it, right?  We

don't think that's a separate, we don't think you need to

address it in another way.  If you wanted to, nothing wrong

with that, but we think that when something is enclosed within

something else, that inherently tells you all you need to know

about what it means to be embedded.

**THE COURT:**  Okay.

**MR. STEVENS:**  Did you have one other question?

**THE COURT:**  I didn't.

**MR. STEVENS:**  Okay.  I'm sorry.

1          Now, let me go back to the end.

2          So again, 4A I do agree is an example of it being

3     embedded.  No sort of question about that.

4          4B, as it sits on the paper, the patent tells us that's

5     not embedded in the bezel.  In fact, the patent tells us it is

6     against the back surface of the bezel.  You would have to do

7     what we have done here in annotating 4B to take this

8     alternatively putting it into the pocket, which would be an

9     example now of embedding it into it.

10         So the patent is telling us repeatedly that these are two

11    different concepts.  I don't think there's a dispute about that

12    because that's what their experts said, that's what the patent

13    says.  There's adjacent to or touching on the one hand, and

14    truly embedded in, you know, for example, like in a pocket of

15    the other material on the other hand, and that's what

16    "embedded" means.

17              **THE COURT:**  But even just -- I'm looking at column 9,

18    line 36, Figure 4B is a cross-sectional view of another

19    illustrative electronic device having a bezel with an embedded

20    heart sensor lead.

21              **MR. STEVENS:**  Yep, yep.

22         So I'm going to get really precise in the wording here.

23    It says it's an embedded heart sensor.  It's embedded in the

24    phone.  It's not embedded in the bezel.  In fact, Apple is the

25    one that has pointed out that this phrase that you just read

1   does not use the words "embedded in."  Apple has told the PTAB

2   repeatedly --

3        May I have the document camera for a quick moment?  Thank

4   you.

5        So this is in Exhibit P to our briefing.  This is the oral

6   argument where Apple says, the notion of embedded in, which is

7   the two word for -- pardon me, Your Honor.

8        Apple says the two-word phrase in the claim "embedded in"

9   is inherently a narrower concept than just the word "embedded,"

10  for example, as Your Honor read it in that sense.  Apple --

11       **THE COURT:**  But this is simpler.  You seem to be

12  trying to draw a distinction between drawing 4A and 4B --

13       **MR. STEVENS:**  Yes.

14       **THE COURT:**  -- and it just seems to me the language

15  is exactly the same.

16       4A is a cross-sectional view of an illustrative electronic

17  device having a bezel with an embedded heart sensor lead.  4B

18  is a cross-sectional view of another illustrative electronic

19  device having a bezel with an embedded heart sensor lead.

20       So to the extent you're trying to distinguish A and B, 4A

21  and 4B, I don't understand.

22       **MR. STEVENS:**  So at the beginning of the paragraphs

23  that you just read, it says that there's a heart sensor

24  embedded in each of those.  Okay?  That part's true.  There is

25  a heart sensor embedded in the phone in each one of those.  It

1  goes on when it talks about 4A, and then it further says that

2  in 4A, the lead is embedded in the bezel of the phone.  Okay?

3  I don't disagree that there is a lead embedded in the phone, in

4  some material in the phone in both those examples, but the

5  distinction I'm trying to draw for Your Honor is that in 4A it

6  explicitly tells us that the lead is embedded within the bezel,

7  which makes sense.

8          THE COURT:  It actually says lead -- in 4A, lead can

9  be embedded along the outer surface of bezel 410.

10          MR. STEVENS:  Uh-huh.  It is.  That's exactly right.

11  It's in the pocket, right, that allows it to be on the outer

12  surface.  So if I were to touch 4A, I'm going to, you know, I'm

13  going to physically make contact with that, but it is within a

14  pocket in that bezel, right?  So that's an example of it being

15  not just a sensor embed in a phone, but also the lead embed in

16  the bezel.

17      4B, though, is different.  4B, when you get to the

18  language of that paragraph, you'll find describes it very

19  differently.

20      If I could have the slides back, I would appreciate it.

21      There's a very important distinction there.  4B, again, in

22  line about 43 to 44, says:  Lead 472 of the heart sensor can be

23  positioned against the back surface of the bezel.  So as 4B

24  exists in the patent, it is not embedded in the bezel.

25          THE COURT:  The next line is:  Alternatively, lead

1    472 can be placed within the thickness of the bezel.

2        **MR. STEVENS:** Correct, alternatively. What you don't

3    see here --

4        **THE COURT:** Okay. We got to wrap up this term.

5        **MR. STEVENS:** With that I don't have any other. I

6    don't have anything else. I'm happy to answer any further

7    questions you might have.

8        **THE COURT:** That sounds good.

9      All right. The court reporter needs a short break, so

10   let's finish, and then really we're on track for three hours,

11   which is too long. So let's streamline things. We'll be back

12   at 11:52, and I really would like to be done by 12:30.

13       **MR. DE VRIES:** Yes, Your Honor.

14     (A recess was taken from 11:42 a.m. to 11:52 a.m.)

15       **THE COURT:** All right. Next up, bezel.

16       **MR. DE VRIES:** Your Honor, some good news. At the

17   break, AliveCor agreed to our construction of bezel, and so we

18   can put that in with the joint -- as a joint filing to reflect

19   that.

20       **THE COURT:** Very good.

21       **MR. DE VRIES:** And so we have -- we're going to stick

22   to our hour. We've used 39 minutes, and we're going to stick

23   to our hour estimate.

24     Before we jump into the '533 patent, I was going to see if

25   I could spend just less than 60 seconds addressing that Figure

1    4B issue with respect to "embedded in."

2              **THE COURT:**  Sure.

3         **MR. DE VRIES:**  Thank you.

4         So what's going on, Your Honor -- if we could put up

5    slide --

6              **MS. RUBSCHLAGER:**  Before we move on, just one second.

7    We wanted to follow up on the bezel.

8         And just to be clear for the record, the parties have

9    agreed to Apple's construction, but it is not that no

10   construction is necessary.  We actually agreed on a specific

11   construction, and we'll submit that in the papers.

12             **THE COURT:**  Fair enough.

13             **MS. RUBSCHLAGER:**  Thank you.

14        My apologies.  This is Katherine Rubschlager on behalf of

15   AliveCor.

16             **MR. DE VRIES:**  So, Your Honor, like I said, I'd like

17   to address this.

18        What they're asking Your Honor to do is to not include the

19   "partially surrounded by" aspect of our construction and the

20   PTAB's construction because they're asking Your Honor to find

21   that 4B, as illustrated in the patent and as I'm showing here,

22   is not an embodiment of "embedded in."  That is wrong.  The

23   language that's used, as Your Honor was pointing out, is

24   exactly the same between 4A and 4B.  And it doesn't just talk

25   about an embedded heart sensor, it talks about an embedded

1    heart sensor lead, and it describes exactly how that's embedded

2    for both 4A and 4B.

3         The PTAB, in its ruling, if we could go to slide 30, it

4    concluded, as you can see in that bottom part of the paragraph

5    there, that 4B is an embodiment.  Dr. Kenny said it was an

6    embodiment, and what is accurate, if go look at what Dr. Kenny

7    submitted in support of the IPRs, he did say that "partially

8    surrounded by" is necessary in order to include that

9    embodiment.  It's true that there is a third embodiment that is

10   not shown, the one that was depicted by -- in the alteration of

11   the graphic by AliveCor, but the request that Your Honor remove

12   the "partially surrounded by" would read out that embodiment

13   and would be incorrect.

14        And what now it's really kind of I think a new position as

15   far as I'm hearing it that "embedded in" be limited to set in,

16   like within the housing in the way that was shown in that third

17   figure, is inconsistent with the patent.  In that 4B

18   embodiment, it shows that the embedded lead, that's exactly

19   what's talked about in that paragraph, is embedded, as

20   Dr. Kenny does explain, because it is partially surrounded by

21   the curved aspect of that bezel.

22        So it's really important to include that aspect of our

23   construction.  That's it, Your Honor.

24             THE COURT:  All right.  Fair enough.

25             MR. DE VRIES:  Thank you.

1          THE COURT:  So last term is which?

2          MR. ALPER:  The -- this is Adam Alper for Apple, Your

3    Honor, and it is the '533 patent, the "a first electronic

4    device" term.

5          THE COURT:  All right.

6          MR. ALPER:  May I proceed?

7          THE COURT:  Yes.

8          MR. ALPER:  Thank you, Your Honor.

9      So if we could go to slide 58 of our slides -- I guess I

10   have a controller here -- I've laid out the disputes between

11   the parties.

12     So this is a phrase, it's in the preamble of Claim 20 of

13   the '533 patent.  The parties agree that this is limiting, so

14   that's not in dispute.  And when it comes to this phrase, we

15   say that it gets its plain and ordinary meaning.  And what I've

16   shown on the right is really the key issue.  It's AliveCor's

17   insertion of an additional requirement into the claim language,

18   and that is that the electronic device of the claim language,

19   which says, an electron device with a display and one or more

20   input devices, including a biometric sensor, AliveCor says that

21   the display and the bio' -- the input devices need to be

22   integrated in the first electronic device.

23     And so I want to get into the evidence, but first just

24   focus -- I want to answer Your Honor's questions, and those

25   are -- this was not -- this term was not at issue in the IPRs,

and so there's no issue, no different constructions that were
proposed, and there's no disclaimer argument here.  There's
actually no disclaimer argument in the briefs either, and that
will ultimately make this a very straightforward issue for the
Court, and that is whether the embodiment that -- or at least
their interpretation of the embodiment should support an
additional requirement of the claims, and we think of course
under the Federal Circuit law that's incorrect.

Let me draw a circle around what the dispute is here when
I go to slide 59, and that is what does "integrated" mean to
them?  And it could mean a number of different things.  It
could be functionally integrated or it could be physically
integrated, and they mean physically integrated.  So what they
are saying is that the display and the one or more input
devices need to be in the same housing, a single housing, with
the first electronic device.

And that makes this a pretty simple issue for us, and I'll
start with the claim language.  Claim language just doesn't say
that.  That's just not in the claim language.  It says, a first
electronic device with a display and one or more input devices.
In other words, accompanied by them.  It doesn't say that they
need to be in the same housing.

And, in fact, when we go to AliveCor's brief, how they
characterize their construction, they talk about how the claim
language itself requires the electronic device include both an

1    integrated display and integrated input devices.  The claim

2    language does not require that.  And not only the phrase, by

3    the way, Your Honor, that we're looking at.  You can look all

4    the way down the entire claim.  There isn't a single element of

5    this claim that even implies that that's a restriction, nor

6    have they suggested that.  In fact, the rest of the claim, this

7    isn't a claim that says a first electronic device which

8    includes, and then lists out a bunch of elements.  It's about a

9    program that does a bunch of things.  And so there's no element

10   in here that applies their construction.

11       But look what they say next.  They say, it cannot be met

12   by two different devices.  And when you look at the claim

13   language, the plain claim language itself, it's wholly

14   inconsistent with it, because the claim language talks about a

15   first electronic device with one or more input devices.

16   Already the claim language talks about two devices.  And then a

17   display, which obviously is a device, and the specification

18   refers to it as a device.

19       So their interpretation of their own construction is

20   inconsistent with the plain claim language.

21           THE COURT:  Well, that seems -- it doesn't seem that

22   their construction excludes multiple devices, it refers to

23   input devices just like the claim does.  It's just the dispute

24   here I'm gathering is whether they have to be in the same

25   housing or not.

1          **MR. ALPER:**  Exactly, Your Honor.  That is exactly

2     right.

3          So using the word "devices" is not -- we -- is probably

4     not the best way to frame the dispute, that's why I said

5     housing, because the claim language uses "devices" a couple of

6     times.  So I hundred percent agree with what you just said.

7          So let's talk about -- I want to talk a little bit, just

8     touch on background and get into the specification and get to

9     their key argument, and that will be essentially -- get to

10    their two arguments, and that will be my presentation.

11         So first we saw this in the background.  We talked about

12    traditional ECG devices, and this is of course in the

13    background, background context.  And in the examples that we've

14    seen, you've got ECG devices that are not all within the same

15    housing.

16         So here you can see there are various sensors.  They're

17    coupled to an input device.  These are all separate components

18    from the machine that the nurses or a technician is standing in

19    front of.

20         And that is the case with all sorts of other electronic

21    devices that are with displays and one or more input devices,

22    like desktop computers that have displays and input devices,

23    like keyboards and mouses and stuff like that; gaming systems

24    with displays and input devices, like joystick controllers and

25    microphones and speakers and so forth; and then multimedia

1    device players, which, like TIVOs and DVD players, which, with

2    displays and input devices like a TV and a remote.

3         And the reason I'm showing you this, Your Honor, is not

4    just a matter of background.  This -- those devices are the

5    devices that the patent identifies expressly as first

6    electronic devices.  So when the patent goes through its

7    examples of what can be one of the devices of the patent, it

8    talks about desktop computers, gaming systems and multimedia

9    player devices.  And while those devices, could they all be

10   within one housing?  Maybe.  But the vast majority of the cases

11   they are not, and they have displays and input devices as

12   separate components.

13        And so when we think about the plain and ordinary meaning

14   of the claim language -- and I'll get to more instances of the

15   specification when I talk about their primary arguments, but we

16   just take a step back and look at the -- think about the plain

17   and ordinary meaning of the claim language and what just anyone

18   looking at a device with a display and one or more input

19   devices would mean, and when you think about how the patent

20   says, by the way, that could be a desktop computer, a gaming

21   system or a multimedia player device, in addition to a whole

22   list of other types of devices which do not need to be

23   portable -- you can see in that portion of the spec at column

24   29 to column 30 that I'm citing to here on slide 64, we know

25   that "with" does not mean~-- the term "with" in the claim

```
1   language does not mean within a single housing.
2        So that's the claim language and the plain and ordinary
3   meaning of it.
4        So what do they say?  What does AliveCor say?
5        They say this in their brief, this is between pages 18 and
6   19, that the '533 patent repeatedly describes electronic
7   devices with integrated input devices.  And let's just -- and
8   the example that they point to, and I'm sure you'll hear this
9   in their presentation, is the watch, the smart watch.  And I've
10  shown that down at the bottom.
11       And let's just say for a moment they're right.  We
12  disagree with that.  We think that there are other examples
13  where all of those elements are not in a single housing.  But
14  let's just say that they are right that the patent repeatedly
15  describes electronic devices with those integrated components.
16  I don't have to show you this, but I'll, just to voice it over,
17  that is definitely not enough.  The Federal Circuit is clear
18  that even if there's a single embodiment in the patent that is
19  a certain way, that is not sufficient to introduce a
20  requirement into the claims as they are suggesting.  And the
21  only way you can do that is when the patentee has acted as his
22  or her own lexicographer or if there is a clear disavowal.  And
23  in this term, Your Honor, there is no dispute.  Neither of
24  those situations are here.
25       So they are straight up asking you to read an aspect of
```

1    the embodiment into the claims, and that is not allowed.  Not

2    only is it not allowed, but it is inconsistent with the weight

3    of the intrinsic record.

4        So what I'd like to do now is move on to show you why the

5    intrinsic record actually contradicts their construction, but

6    we should be done right there because this is just black letter

7    law.  We don't read requirements in when they're based on

8    embodiments in the specification without more.

9        So let's talk about what some of the other embodiments

10   are.

11       So this is a passage that I'm showing you from column 40

12   at lines 55 through 65, and on the left I have the smartphone

13   embodiment in Figure 6F, and on the right I have the smart

14   watch.  And if we look at the passage that I've displayed here,

15   it says:  Figure 6F illustrates first electronic device 600A.

16   And that's what I've shown on the left; 600A is the smartphone.

17   So we already know that a first electronic device can be a

18   smartphone, and it says that it has a display, and that's what

19   I've highlighted in purple.

20       But then when you read down, when it comes to obtaining

21   the heart rhythm information and heart rate information -- this

22   is what I've highlighted in green in that passage -- how do you

23   do that with this first electronic device?  You use the smart

24   watch that's paired to that first electronic device.

25       And so what that tells us is that you can satisfy Claim 20

1    with a first electronic device being the smartphone, and a

2    smart watch which acts as the sensor and -- or the input device

3    with the biometric sensor.  And that is paired, as it says

4    expressly there, with the first electronic device.

5        So what do they say about this?  They say that this is an

6    unclaimed embodiment, or this is not claimed by Claim 20, and

7    what they say is that the display that I've highlighted in

8    purple doesn't meet the requirements of the display in Claim

9    20.  They say the display in Claim 20 requires an indication of

10   progress, and what is being shown here doesn't have an

11   indication of progress.

12       We totally disagree with that, and I'm going to show you

13   why that's wrong in a minute with some figures from the patent.

14   But they're missing the point.  The specification says

15   expressly here in Figure 6F the smartphone is the first

16   electronic device, and that it gets the information about the

17   heart rate and other heart information by using the smart

18   watch.  And even if, let's say, the display is on the smart

19   watch and the sensor's on the -- and the input device with the

20   sensor is on the smart watch.  That still doesn't change the

21   fact that the first electronic device is the smartphone.  And

22   the only way that would be excluded, that arrangement, what I

23   just described would be excluded from Claim 20, is if you

24   insert their requirement, which is not present in the claim

25   language.

1          So, but we disagree with their interpretation of this

2     embodiment.  It is absolutely presenting what is in Claim 20

3     even from their perspective.

4          And if you go to the next slide, does the phone include

5     the display that shows an indication of progress?  It

6     absolutely does.  You can see in the two figures that they

7     show.  It first shows that recording is in progress, and then

8     it tells you when reporting is complete on the right, and that

9     is the indication of progress.

10          And by the way, Your Honor, they have now agreed that our

11     perspective on that is correct.  So that now is agreed meets

12     that claim element, and you can see it's being done on the

13     phone.  And look to the right.  It's being done with the watch.

14     The watch is acting as the input device with the sensor.  And

15     so to exclude this embodiment of course would be a hundred

16     percent incorrect.  But again, the claim just doesn't have the

17     requirement.  The only way that you get there is by adding in a

18     requirement that's not present.

19          Let me just briefly hit a couple of other things, Your

20     Honor, and then I'll conclude.

21          So this is slide 69.  This on the right is the passage

22     from the specification, but a little more of it that talks

23     about the desktop computer, the multimedia device, the gaming

24     system and other devices that can be that first electronic

25     device, but I've expanded it, and now I've shown you here

1    Figure 3, which is the figure of the patent that that passage

2    is actually talking about.  And I want to just make a couple of

3    points here.

4        One is when you look at -- I haven't highlighted them

5    here, but when you look at some of the other things like the

6    other potential embodiments, some of them are all enclosed,

7    like a laptop computer, tablet computer.  But they actually

8    specifically cull out other types of devices where the displays

9    and the input devices are not necessarily all enclosed.  And

10   that is hugely significant here, because we would need -- this

11   is a tall order now that they're asking for us to start

12   excluding every one of these types of devices forever by adding

13   their requirement to the claim.

14       But then when you look at Figure 3, I think there's a

15   couple of important things to point out.  Now, this is a

16   conceptual functional diagram, it's not physical, but what I've

17   highlighted in blue, and it is what they call one or more

18   communication buses.  So these are communication lines that

19   connect to the processor within this thing, and it connects to

20   what you can see in the middle, an I/O interface, an input/

21   output interface, and that connects to these various input/

22   output controllers.

23       And so what the device has on it are controllers that

24   allow you to connect to the display, a keyboard and a mouse,

25   touch pad, sensors and so forth.  And that's what's being

described, not that they all must for now and forever be part

of the first communication device in a single housing.

Okay.  I want to go to one more point, and that is the --

their second argument.  First argument is it's -- shows that

this -- there are a way a lot of times in the spec.  The second

argument is a claim differentiation argument, and they say the

combination, when you read Claim 35 with Claim 20, that that

means that their construction is right.

So there's a couple of issues with this.

One is typically when you have a claim differentiation

argument, we would be arguing that the independent claim has a

certain narrow construction, and then you'd -- they would show,

well, Claim 35 adds that narrowing element to the claim, so

claim~-- the independent claim must be broader.  That is not

our situation at all.  So like the traditional claim

differentiation approach doesn't work here.

And, in fact, when you look at what Claim 35 adds, it's a

totally different functionality.  And so it adds recording two

different types of -- two different, first for recording of a

first biometric information, a second recording of a second

biometric information that's different from the first biometric

information.  So those are two requirements that are not

present in the independent claim.  And then it says you're

going to transmit that to a second electronic device.

That has no bearing on whether the display and the one or

more input sensors are in a single housing with the first

electronic device.

And what the Federal Circuit law says, and I kind of put a

case law together here, but we cited this in our brief, says

that the claims need to be identical with the exception of what

you're differentiating.  And as I said, it doesn't even work

here, because we're saying, we're actually arguing for the main

and ordinary meaning, which is the broader construction.

They're the ones arguing for the narrowing construction.  So

differentiation just doesn't make any sense.

So they have no claim language support, and they're purely

relying on what they say is an embodiment in the specification,

which isn't even the only embodiment.

So unless you have questions, Your Honor, that's my

presentation.

**THE COURT:**  I don't.  Thanks.

**MR. ALPER:**  Thank you.

**MR. DUCKER:**  Apologies, Your Honor.  I'm going to say

good afternoon.  I know you wanted to be done in the morning.

I will be quick.  This is Philip Ducker from Alston & Bird on

behalf of defendant, AliveCor.

So we saw this figure in the tutorial a couple weeks ago,

but the main point I want to make is that this patent and these

claims are really about user interfaces, and they are user

interfaces designed to help a user record biometric

 1    information.

 2         So counsel for Apple I think laid out what he believed the

 3    dispute is.  I think I disagree slightly with his

 4    interpretation of the dispute.  We believe the dispute is

 5    whether or not the first electronic device, the only device

 6    claimed in the preamble, must contain both a display and a

 7    biometric sensor or an input device including a biometric

 8    sensor.

 9         Apple asked for a construction in which the display and

10    the input device with a biometric sensor can be two different

11    electronic devices, and that's what we don't think is supported

12    by either the claim language or the specification.  And now

13    counsel put up tons of pictures of input devices, keyboards and

14    all sorts of things.  Our construction does not actually

15    exclude most of those, because those are not input devices with

16    a biometric sensor.

17         If you look specifically at just the discussion in the

18    patent in the intrinsic record of input devices with a

19    biometric sensor, there are only two.  Oh, sorry, Your Honor.

20    I think I should have stood somewhere else, because I can't see

21    the screen.

22         THE COURT:  You can move wherever you want.

23         MR. DUCKER:  All right.  So here we have Figure 6A in

24    the '533 patent.  And this figure illustrates a first

25    electronic device, and it includes an input device 606, and

that input device 606 is a mechanical button.  And as you can
see, that button is integrated into the housing, and it
includes the biometric sensor, a fingerprint sensor.  So that's
what the -- one example in the patent.

Next, the only other example is that the patent describes
are electrodes.  So here we have Figure 8A.  This is the smart
watch that counsel described.  And here we see the input
device, including the biometric sensor, is 804.  And again,
that's integrated into the first electronic device, which in
this case is the watch.

There's other biometric sensors integrated into the watch,
as well, and these are the electrodes.  They're not shown, but
they are on the back of the watch and they are integrated
specifically, I think this says, into the housing portion.

So the patent describes examples of first electronic
devices, including input devices with a biometric sensor.  It
never shows any examples in which there are devices outside the
actual electronic devices.

THE COURT:  All right.  But isn't your opposing
counsel right that the Federal Circuit has said that even if
that were true, even if the only embodiment had certain
characteristics, that doesn't mean it's appropriate for me to
import the characteristics of that embodiment into the claims?
Why -- as a matter of law, what's your response to that?

MR. DUCKER:  So I think the claim language itself

1    requires that everything be embodied in the housing.

2        And so, again, we disagree that the claim language here

3    would -- is clear on its face that it would include all these

4    external devices.  The way I read it, an electronic device with

5    a display and one or more input devices, including a biometric

6    sensor, is you have a single electronic device that has both of

7    these components.

8        **THE COURT:**  But when you say, "the way I read it",

9    based on what?  That's what this whole word game exercise we're

10   playing is.  What is the basis for your reading?

11       **MR. DUCKER:**  Sure.  So let me just walk through.

12       I'm going to repeat I think a little bit what counsel

13   said, but what this claim was actually directed to, what it

14   claims is non-transitory computable readable storage media, and

15   that is just memory.  That memory stores one or more programs,

16   and those programs have to be executed by one or more

17   processors of a first electronic device.

18       So no one disputes that the memory and the programs and

19   the processors are in the first electronic device, but Claim 20

20   requires that the one or more processors of the first

21   electronic device execute programs that, among other things --

22   so first they have to display a first user interface indicating

23   that the first electronic device is ready to detect biometric

24   information.  So the first electronic device is what is ready

25   to detect the information.

1      And by the way, the display is the display of the first

2  electronic device, not the display of some other electronic

3  device.

4      But then if you look at the next limitation, it says that

5  the programming must also detect a first input with a biometric

6  sensor that satisfies first criteria.  If you're telling the

7  user that the first electronic device is ready to detect

8  biometric information and then that device needs to detect it,

9  you are pointing out, you are looking at the same device.  You

10  are not looking at multiple devices in which you are -- the

11  display is on one screen and the input is on another.

12      And this is just, you know, because they wanted to say

13  that it could be multiple devices.  I mean, under their

14  construction you could have like six different devices, all of

15  which do and meet one of the functions in one of the programs,

16  and we just disagree.  This case, *Salazar versus AT&T Mobility*,

17  you know, give a good analogy, very simple, that if you have a

18  dog that rolls over and fetches sticks, it does not suffice

19  that he had two dogs, each able to perform just one of the

20  tasks.

21      And here we have a first electronic device, and it is

22  not -- it does not suffice to say that you can have multiple

23  electronic devices meeting the different limitations of the

24  claim.

25          **THE COURT:**  Well, but what they're -- you're saying

1    is that "device" means whatever you can cram into a housing,

2    and they're saying that that's not required by the patent.  And

3    so it's not really that there are multiple devices, it's -- the

4    dispute here is this integrated provision that you are

5    positing.

6            MR. DUCKER:  So I disagree.

7        And what they do is they -- and the counsel pointed out I

8    think this example where he showed the phone working with the

9    watch, and here you have two different devices performing,

10   according to them, performing different parts of the claim.

11   But if --

12           THE COURT:  The claim itself requires one or more

13   input devices.  So you would agree that under the claim, that

14   means that there can be multiple input devices that are part of

15   the first electronic device.  There's no dispute about that.

16           MR. DUCKER:  No, there's no dispute.

17       I mean, what I would say is that the claim doesn't

18   actually have anything to do with just straight input devices,

19   it has to do with input devices that include a biometric

20   sensor.

21           THE COURT:  No question, but that's the dispute that

22   we have.  It involves devices with biometric sensors, so ...

23       But the point -- well, I'll just let you go.

24           MR. DUCKER:  So I think this was one of the

25   illustrations that counsel provided where he said that the

1    first electronic device was a phone and the second electronic

2    device was the watch, and that this fell within the scope of

3    the claims.  I -- I have a strong disagreement with that,

4    because what he left out of his description was what we're

5    looking at in 6F and not looking at the phone recording

6    biometric information.  We're looking at a tutorial for

7    performing initial setup of the ECG management features and the

8    associated ECG applicants and instructions on how to perform a

9    function, which is taking an ECG using the ECG applicant on a

10   smart watch paired to the device.  This is not a claimed

11   embodiment.  They are simply -- the phone in these embodiments

12   gives the user instructions about how to take the ECG on the

13   watch.

14       And again, we're not reading out -- again, I'll just

15   reiterate, we aren't reading out preferred embodiments.  We

16   believe that the claim reads on this embodiment of Claim 20,

17   which is what we saw at the beginning, and that Claim 35 reads

18   on the other embodiment, and that the law is clear, not every

19   claim needs to read on every embodiment.

20       So unless you have other questions, I'll end there.

21            **THE COURT:**  I don't.  Thank you.

22            **MR. ALPER:**  Your Honor, may I have --

23            **THE COURT:**  You can.  I actually want to get your

24   response, because that tutorial issue was one that I noticed.

25   And so that's what I think would be the most helpful for you to

1    address.

2                **MR. ALPER:**  Yes, let me just go to that first.

3          So if I go to my slide.  I think it's slide 67, please.

4          So I think the argument is the passage that I showed is

5    actually about a different functionality.  It's about showing a

6    tutorial.  That is inconsistent with what the specification

7    says.  I'll give you -- I think it's inconsistent with what's

8    said here, and then in other places, as well.

9          So here you have a first electronic device, and it is

10   paired with the smart watch for what I would say is the -- as

11   the input sensor, and it literally says it.  It says, for

12   recording heart rhythm.  That's where the phone gets the heart

13   rhythm and rate information, by being paired to the smart

14   watch.

15         And then if we go to the next slide, this is slide 68, we

16   can see that in the Figures 8E and 8J it shows that the smart

17   watch now is providing the display aspect of the claims.  And

18   so although it does talk about using the phone for tutorial

19   purposes, educational purposes, it certainly also talks about

20   using the phone in where the phone is used for the display and

21   the watch is used as the sensor or the input device.

22               **THE COURT:**  I just, I'm looking at -- so it's column

23   40, line 55 is where the discussion of Figure 6F is.

24               **MR. ALPER:**  Yes.

25               **THE COURT:**  And so it says:  6F illustrates first

1    electronic device 600, which is the smartphone as we've been

2    talking about.  But it says:  Displaying a first page of the

3    tutorial for performing initial setup of the ECG management

4    features, blah, blah, blah.  And then it says:  In some

5    embodiments, first page of the tutorial includes a text

6    description.

7         I guess where in that description do you think there is a

8    description of the use of the associated ECG application that

9    is coming from the smart watch?

10        **MR. ALPER:**  Sure.  And I'll explain where I think it

11   is there, and then I'll point you to another passage that

12   actually counsel raised in column 39.

13        But first here where it talks about instructions on how to

14   perform the function.  So now it's talking about performance of

15   the actual Claim 20, and it says:  For instance, using the

16   applicant on a smart watch -- or, I'm sorry.  It's talking

17   about -- I'm sorry.

18        **THE COURT:**  Where are you right now?

19        **MR. ALPER:**  Let me start again.  I did a poor job

20   there.

21        So column 40, at line about 61, where it's describing a

22   function of the ECG management features and associated ECG

23   applicant.

24        So what's one of the functions of this biometric-sensing

25   invention?  It says, for instance, recording heart rhythm

information and/or heart rate information.  And then it talks

about, in instructions on how to perform the function, e.g.,

using the associated ECG applicant on a smart watch paired to

the first electronic device.

    So now it's not just talking about tutorializing.  It's in

the context of describing a tutorial about how you do it, but

it says, when you actually do it, you're going to use the smart

watch paired to the first electronic device.

        **THE COURT:**  Is there a description of that when you

do it somewhere?

        **MR. ALPER:**  I think there's a couple.

    So if we go up to column 39 at line 4, this was the part

that counsel referred to.  It talks about Figure 6A illustrates

a first electronic device, and 6A is the smartphone.  And what

counsel focused on was how the input sensor was on the phone.

But if you read down, it says, about line 16:  In some

embodiments, first electronic device 600A is paired with a

second electronic device, e.g. a smart watch.  So it's telling

you that you can do that, the sensing element, by pairing with

a smart watch.

    And then when we look at, again, if we go to my slide 68,

when we look at Figures 8E and 8J, you can see that in action,

where the smart watch is doing the sensing and the display on

the smartphone is providing the indication of progress.

        **THE COURT:**  I see.

1      Although, in just looking at column 39, line 16, where you

2    were just reading, if the first electronic device is 600, a

3    smartphone, and that's being paired with a second electronic

4    device, for example a smart watch, does that mean that the

5    smart watch is not actually part of the first electronic

6    device?

7           MR. ALPER:  Well, it's -- it means that the smart --

8    what it means is that the input sensor doesn't need to be part

9    of the same physical housing as what is the first electronic

10   device; that they can be peripherals to each other and they

11   don't need to be part of the same housing.  That's what the

12   upshot of that is.  Because if you're using the smart watch as

13   the sensor and it's paired via, for instance, Bluetooth, what

14   that's telling you is that their construction can't possibly be

15   right, because a first electronic device with an input sensor.

16   Let's just replace the word "input sensor" with a smart watch.

17   "With a smart watch" doesn't mean that that smart watch has to

18   be in the same physical housing as the first electronic device.

19      That's the point is that this is -- the specification is

20   repeatedly saying that you can have first electronic devices

21   with input devices and displays that are not part of the same

22   physical housing.

23           THE COURT:  I see.  But they're not -- I'm just going

24   back to the claim language to tie it back.  It's Claim 20?

25           MR. ALPER:  Claim 20, yes.  I can put it on the

```
 1   screen, too.
 2           THE COURT:  I see.  So first electronic device
 3   presumes one or more input devices.  And as we've been going
 4   back and forth on, the only dispute here really is whether it
 5   has to be in the same --
 6           MR. ALPER:  Housing.
 7           THE COURT:  -- plastic housing or not.
 8           MR. ALPER:  Exactly.
 9       And look at the -- and this was going to be my 60-second
10   point, Your Honor, on the claim language.
11       Well, let me, before I make that point, let me just pause
12   and make sure I answered your question on the specification.
13           THE COURT:  You did.
14       MR. ALPER:  Okay.  So whether you look at the claim
15   language, it says:  A first electronic device with a display
16   and one or more input devices.  Just says "with."  It doesn't
17   say integrated in, it doesn't say in a single housing, doesn't
18   say any of that.  So they are actually reading a requirement
19   into the claims that is not present there is.
20       And a couple of points I wanted make are, first of all, I
21   believe they made some claim language points just now that I
22   don't think were in the briefing.  That's fine, because I can
23   respond to them here if that's correct.  I'm not a hundred
24   percent sure, but regardless I want to respond to them.
25       First of all, when a claim has a device, right, a first
```

electronic device, the black letter Federal Circuit law is

that's not one device, it's one or more devices, and that's

what the law says there.

        And then counsel pointed to other elements in the claim,

like the part that talks about a first electronic device is

ready to detect biometric information.  And what he said was

that must mean that the sensor has to be physically integrated

in the first electronic device, but that presupposes their

construction.  If you look at this the way it's actually

phrased and you think about it that it could be that way, but

it could also be the device that has a wire that goes to a

sensor, just like on ECG machines or all of those other

examples like desktop computers and so forth, then that makes

complete sense.  And that's the problem with their reading is

that they're actually reading their -- they're reading the

requirement in and then saying that all of these other

embodiments are excluded.

        **THE COURT:**  Right.

    Okay.  Thanks.

        **MR. ALPER:**  Thank you, Your Honor.

        **THE COURT:**  All right.  So I will take the claim

construction issue under submission.  I'll look for, from you

all, the updated summary of everything that's now been

resolved.  I think probably the most efficient way to do that

is to take what you already filed yesterday and just supplement

1    it so it's all in one place, and then I will aim to issue a

2    ruling as soon as I can and we'll see where the case goes from

3    there.

4             **MR. DE VRIES:**  Thank you, Your Honor.

5             **THE COURT:**  You're welcome.

6        (Proceedings concluded at 12:34 p.m.)

7                         ---o0o---

8                 <u>**CERTIFICATE OF REPORTER**</u>

9        I certify that the foregoing is a correct transcript

10   from the record of proceedings in the above-entitled matter.

11   DATE:  Sunday, August 31, 2025

12

13

14   _____

15        Stephen W. Franklin, RMR, CRR, CPE
         Official Reporter, U.S. District Court

16

17

18

19

20

21

22

23

24

25