UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| APPLE INC., | Case No. 22-cv-07608-HSG |
| Plaintiff, | **CLAIM CONSTRUCTION ORDER** |
| v. | Re: Dkt. No. 140 |
| ALIVECOR, INC., | |
| Defendant. | |

On December 2, 2022, Plaintiff Apple, Inc. filed this action against Defendant AliveCor, Inc. for patent infringement. Dkt. No. 1. The parties now seek construction of five terms found in two asserted patents. This order follows claim construction briefing and a claim construction hearing. Dkt. No. 140 ("Apple Br."), Dkt. No. 144 ("AliveCor Br."), Dkt. No. 145 ("Reply Br."); Dkt. Nos. 151, 160.

## I.   BACKGROUND

Apple accuses AliveCor of infringing U.S. Patent Nos. 10,076,257 (the "'257 Patent"); 10,270,989 (the "'898 Patent"); 10,866,619 (the "'619 Patent"); and 10,568,533 (the "'533 Patent") (collectively, the "Asserted Patents"). Dkt. No. 1. The Asserted Patents relate to technology that embeds heart rate monitors in electronic devices and software making those devices effective. The parties agreed to constructions of all disputed terms from the '619 and '898 Patents. *See* Dkt. No. 161 at 2–3.

### A.   The '257 Patent

The '257 Patent is entitled "Seamlessly Embedded Heart Rate Monitor" and issued on September 18, 2018. Dkt. No. 1-7 at 2. The patent describes an electronic device that has an integrated sensor for detecting a user's cardiac activity that can include several leads. *Id.*, Abstract. The '257 Patent has two independent claims, one of which (claim 1) recites:

United States District Court
Northern District of California

An electronic device for detecting a user's cardiac signal, comprising:

an enclosure;

a heart sensor configured to detect the user's cardiac signal, the heart sensor comprising:

a first lead comprising a first pad that is embedded in a first portion of the enclosure, wherein an exterior surface of the enclosure comprises an exterior surface of the first portion, wherein the first pad is positioned underneath the exterior surface of the first portion, and wherein the first pad is configured to detect a first electrical signal of the user's cardiac signal via the user's skin's contact with the exterior surface of the first portion of the enclosure; and

a second lead comprising a second pad that is embedded in a second portion of the enclosure, wherein the second pad is configured to detect a second electrical signal of the user's cardiac signal via the user's skin's contact with at least one of the second pad and the second portion of the enclosure; and

a processor coupled to the heart sensor and configured to receive and process the detected cardiac signal, wherein the first lead further comprises a first connector coupled to the first pad and configured to provide the first electrical signal detected by the first pad to the processor, and wherein the second lead further comprises a second connector coupled to the second pad and configured to provide the second electrical signal detected by the second pad to the processor.

Dependent claims 2–14 provide additional limitations. Independent claim 15 describes another electronic device that processes electrical signals from a user's cardiac signal but, unlike the device in claim 1, does not receive those signals. Dependent claims 16–22 provide additional limitations.

B.    The '533 Patent

The '533 Patent is entitled "User Interfaces for Health Monitoring" and issued on February 25, 2020. Dkt. No. 1–13 at 2. The patent describes a user interface for health monitoring that includes using multiple electronic devices, recording biometric data, among other functions. *Id.*, Abstract. The '533 Patent has three independent claims—claims 1, 20, and 39. Claim 1 recites the requirements of a "first electronic device." Dependent claims 2–19 recite the method of independent claim 1 with additional limitations. Claim 20 recites:

2

A non-transitory computer-readable storage medium storing one or more programs configured to be executed by one or more processors of a first electronic device with a display and one or more input devices including a biometric sensor, the one or more programs including instructions for:

displaying, on the display, a first user interface indicating that the first electronic device is ready to detect biometric information;

detecting a first input with the biometric sensor that satisfies first criteria;

in response to detecting the first input with the biometric sensor:

starting to record biometric information detected by the biometric sensor; and

displaying, on the display, a second user interface that is different from the first user interface, wherein the second user interface includes an indication of progress in recording the biometric information;

after recording at least a portion of the biometric information, detecting, via the one or more input devices, that the first criteria are no longer met;

in response to detecting that the first criteria are no longer met for a first period of time, resetting the indication of progress in recording the biometric information and maintaining display of the second user interface; and

in response to detecting that the first criteria are no longer met for a second period of time that is longer than the first period of time, replacing display of the second user interface with the first user interface.

Dependent claims 21–38 recite the method of independent claim 20 with additional limitations. Claim 39 recites a separate method of taking biometric information where a second user interface performs concurrent display functions. Dependent claims 40–57 provide additional limitations.

### C.    Agreed Constructions

The parties identified eleven disputed terms, which were narrowed to five during the briefing and the claim construction hearing. They agreed to the construction of two terms from the '898 Patent and three from the '533 Patent, and also agreed that the term "bezel" from the '257 Patent means "a rim that secures a transparent covering for an indicating device." Dkt. No. 161 at

3

2–3.

## II.    LEGAL STANDARD

Claim construction is a question of law to be determined by the Court. *Markman v. Westview Instruments, Inc.*, 517 U.S. 370, 384 (1996). "The purpose of claim construction is to determine the meaning and scope of the patent claims asserted to be infringed." *O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1360 (Fed. Cir. 2008) (quotation omitted). Accordingly, "[w]hen the parties present a fundamental dispute regarding the scope of a claim term, it is the court's duty to resolve it." *Id.* at 1362; *see also Eon Corp. IP Holdings v. Silver Spring Networks*, 815 F.3d 1314, 1319 (Fed. Cir. 2016) (finding legal error in trial court's decision not to construe terms despite fundamental dispute between parties).

It is "a basic principle of claim construction . . . that 'the words of a claim are generally given their ordinary and customary meaning.'" *Source Vagabond Sys. Ltd. v. Hydrapak, Inc.*, 753 F.3d 1291, 1299 (Fed. Cir. 2014) (quoting *Philips v. AWH Corp.*, 415 F.3d 1303, 1312 (Fed. Cir. 2005)). There are only two circumstances where a claim is not entitled to its plain and ordinary meaning: "1) when a patentee sets out a definition and acts as his own lexicographer, or 2) when the patentee disavows the full scope of a claim term either in the specification or during prosecution." *Thorner v. Sony Computer Entm't Am. LLC*, 669 F.3d 1362, 1365 (Fed. Cir. 2012). In disavowing a claim's scope, "it is not enough that the only embodiments or all of the embodiments contain a particular limitation to limit a claim term beyond its ordinary meaning." *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1330 (Fed. Cir. 2012).

In determining the ordinary and customary meaning, the claim language "provide[s] substantial guidance as to the meaning of particular claim terms." *Phillips*, 415 F.3d at 1314. Additionally, "the context in which a claim term is used in the asserted claim can be highly instructive." *Id.* However, a person of ordinary skill in the art is "deemed to read the claim term not only in the context of the particular claim in which the disputed term appears, but in the context of the entire patent, including the specification." *Id*. at 1313. The specification "is always highly relevant to the claim construction analysis" and is usually "dispositive." *Id*. at 1315. The scope of the claims must be "determined and confirmed with a full understanding of what the

inventors actually invented and intended to envelop with the claim." *Id*. at 1316 (quotation omitted). Thus, the construction that "stays true to the claim language and most naturally aligns with the patent's description of the invention will be, in the end, the correct construction." *Id*. In addition to the claims and the specification, the prosecution history may be used "to provide[ ] evidence of how the PTO and the inventor understood the patent." *Id.* at 1317. "[A]ny explanation, elaboration, or qualification presented by the inventor during patent examination is relevant, for the role of claim construction is to capture the scope of the actual invention that is disclosed, described and patented." *Fenner Inv., Ltd. v. Cellco P'ship*, 778 F.3d 1320, 1323 (Fed. Cir. 2015) (quotation omitted). The claims, specification, and prosecution history together constitute the "intrinsic evidence" that forms the primary basis for claim construction. *Phillips*, 415 F.3d at 1312–17 (citation omitted).

Courts may also consider extrinsic evidence, such as dictionaries, treatises, and expert opinions, if it is "helpful in determining the 'true meaning of language used in the patent claims' " and is not contradicted by the intrinsic evidence. *Id.* at 1318 (quoting *Markman*, 52 F.3d at 980). For example, dictionaries may reveal what the ordinary and customary meaning of a term would have been to a person of ordinary skill in the art at the time of the invention. *Frans Nooren Afdichtingssystemen B.V. v. Stopaq Amcorr Inc.*, 744 F.3d 715, 722 (Fed. Cir. 2014) ("Terms generally carry their ordinary and customary meaning in the relevant field at the relevant time, as shown by reliable sources such as dictionaries, but they always must be understood in the context of the whole document—in particular, the specification (along with the prosecution history, if pertinent)."). Expert testimony can also help "to ensure that the court's understanding of the technical aspects of the patent is consistent with that of a person of skill in the art, or to establish that a particular term in the patent or the prior art has a particular meaning in the pertinent field." *Phillips*, 415 F.3d at 1318. Extrinsic evidence is, however, "less significant than the intrinsic record in determining the legally operative meaning of claim language." *Id.* at 1317 (quotation omitted).

## III.    DISPUTED TERMS

### A.    The '257 Patent

#### i.    "wherein an exterior surface of the enclosure comprises an exterior surface of the first portion, wherein the first pad is positioned underneath the exterior surface of the first portion" ('257 Patent, claim 1)

| Apple's Proposed Construction | AliveCor's Proposed Construction |
|---|---|
| Plain and ordinary meaning | Plain and ordinary meaning, which does not include an exposed first pad/electrode. |

The parties dispute whether the plain and ordinary meaning excludes "an exposed first pad/electrode." Apple argues this negative limitations is inappropriate because the patentee did not make a clear disclaimer, and the patent never uses the term "electrode." Apple Br. at 8–9; Reply Br. at 7–10. AliveCor counters that while "electrode" is never used in the patent, it is discussed synonymously with "pads" in the prosecution history, which also "forecloses an exposed electrode design." AliveCor Br. at 13–19. AliveCor seeks a construction to clarify that "the first portion of the enclosure prevent[s] direct user contact with an electrode." *Id.* at 19. The Court finds Apple's argument more convincing.

Courts require "express intent to confer on the claim language" a negative limitation. *Omega Engineering v. Raytek*, 334 F.3d 1314, 1323 (Fed. Cir. 2003); *Nuance Comm'ns, Inc. v. Abbyy Software House, Inc.*, No. C-08-2912 JSW, 2012 WL 1188903 (N.D. Cal. Apr. 9, 2012). "The standard for disavowal of claim scope is . . . exacting." *Thorner v. Sony Compt. Ent. Am. LLC*, 669 F.3d 1362, 1366 (Fed. Cir. 2012). "The patentee may demonstrate intent to deviate from the ordinary and accustomed meaning of a claim term by including in the specification expressions of manifest exclusion or restriction, representing a clear disavowal of claim scope." *Id.* (quoting *Teleflex, Inc. v. Ficosa N. Am. Corp.,* 299 F.3d 1313, 1325 (Fed.Cir. 2002)).

AliveCor's construction seeks to exclude exposed "pad[s]/electrode[s]," but it acknowledges that the term "electrode" does not appear in the patent. AliveCor Br. at 13. AliveCor takes the term "electrode" from the original prosecution history and the IPR proceedings. *Id.* at 13–16. Prior art used the term "electrode" to describe components in their inventions. Dkt. No. 144-4 at 17; Dkt. No. 144-5 at 15. AliveCor claims that Apple, in

distinguishing its invention from prior art, replaced "electrode" with "pad," without intending a substantive difference. AliveCor Br. at 13–14 & n.4 (citing Dkt. No. 144-4 at 4–5). AliveCor then explains that the distinguishing feature between Apple's invention and the predecessors was that Apple's lacked an exposed electrode design that made contact with a user's skin. *Id*. (citing Dkt. No. 144-5 at 13). Similarly, AliveCor contends that Apple distinguished its invention from prior art during the IPR proceeding because prior art "shows an electrode that is at the surface" and did not conceal "the presence of electrodes by positioning them under the exterior surface." *Id*. at 15 (citing Dkt. No 144-2 at 33–34)

AliveCor's characterization of the prosecution history is unsupported. Apple did not adopt the prior art's nomenclature and did not agree that the electrode component in the prior art equated to the first pad or lead. *See* Dkt. No. 144-5 at 16 ("Assuming, arguendo, that Gilles' auxiliary electrode 8 as coupled to case 3/auxiliary device 9 may be equated with a first lead embedded in an enclosure of an electronic device, which applicants do not accept…"). Apple distinguished the prior art from its invention on the basis that the pad was positioned underneath the surface of the enclosure, not because the prior art had an exposed electrode. Dkt. No. 140-7 at 20, 34; Dkt. 144-14 at 12; Dkt. 144-16 at 13. Being "positioned underneath" the surface does not preclude portions of the pad being exposed. *Id.* The Court finds Apple's interpretation is not undermined by the prosecution history.

Separately, AliveCor contends that only the "second pad" may be exposed, not the "first pad." The Court is not persuaded. As Apple argues, the patent explains that the pads are "finished to ensure that the pads are not visible or haptically distinguishable on the device." '257 Patent, Abstract. It would not follow for only one pad to be "exposed" if both are finished to appear indistinguishable.

Finally, AliveCor argues that the Court should construe the disputed term to "orient the trier of fact to the significance of the term in relation to the claim language." AliveCor Br. at 13, 18. But that is not the standard at claim construction. The Court is tasked with interpreting the disputed terms from the perspective of a person skilled in the art. *See Mass Inst. Of Tech. v. Shire Pharms., Inc.*, 839 F.3d 1111, 1119 (Fed. Cir. 2019). And if there is a dispute about the plain and

ordinary meaning, the court must resolve the dispute. *See O2 Micro Int'l Ltd. v. Beyond Innovation Tech. Co.*, 521 F.3d 1351, 1361 (Fed. Cir. 2008). Here, the intrinsic evidence, prosecution history, and IPR proceedings do not show that Apple clearly disavowed an exposed first pad/electrode. The Court thus adopts Apple's plain and ordinary meaning construction, which does not incorporate AliveCor's negative limitation.

### ii.   "embedded in" ('257 Patent, claim 1)

| Apple's Proposed Construction | AliveCor's Proposed Construction |
|---|---|
| Plain and ordinary meaning.<br><br>If the Court determines that an express construction is requires: Plain and ordinary meaning, which is "at least partially set in or partially surrounded by a material" | Plain and ordinary meaning which is "enclosed within a separate and distinct surrounding material." |

The parties dispute whether the plain and ordinary meaning of "embedded in" means "enclosed within a separate and distinct surrounding material" which "requires direct contact with the surrounding material." AliveCor Br. at 6.[1] In its IPR proceedings, AliveCor proposed a different construction, arguing that the plain and ordinary meaning required "inclusion within a larger entity." Dkt. No. 140-19 at 6–10. In the Masimo IPR proceeding, the Board adopted Apple's construction, incorporating "at least partially set in or partially surrounded by a material," which Apple proposes here in the alternative. Dkt. No. 140-12 at 19.[2] The Court agrees with Apple and the Board.

AliveCor contends that its construction requires that the lead "physically touches the surrounding portion of the enclosure (*e.g.*, the bezel) in which it is embedded." AliveCor Br. at 7. The specification does not support this. For example, the section of the specification accompanying Figure 4A does not require the lead to physically touch the enclosure since an isolating layer may separate the two. '257 Patent at 9:26–28. While embodiments can be

---

[1] Apple points out that AliveCor appears to have added the "direct contact" argument to its construction between the Revised Joint Claim Construction Statement, filed on July 9, 2025, and its responsive briefing, filed on July 10, 2025. Reply Br. at 10. The Court also observes that AliveCor abandoned its argument that "embedded in" requires a full enclosure. AliveCor Br. at 11

[2] Non-party Masimo Corporation separately sought inter partes review of the '257 Patent. *See* Dkt. No. 140-12 (IPR2023-00745).

United States District Court
Northern District of California

instructive in determining meaning, claims generally should not be interpreted to exclude disclosed examples. *Wasica Fin. GmbH v. Cont'l Auto Sys., Inc.*, 853 F.3d 1272, 1282 (Fed. Cir. 2017).

AliveCor also seeks to add a limitation that the lead must be "within a 'separate and distinct material'" based on the record from the IPR proceeding. AliveCor Br. at 3. But as Apple points out, Apple never claimed the "pad" and "enclosure" were distinct "materials," Reply Br. at 13, only that they were distinct "components." Dkt. No. 144-2 at 31. The Court agrees with Apple that the pad and enclosure were only presented as "two distinct components of the claimed electronic device." *Id.*

AliveCor argues that Apple's statements in the IPR proceeding establish that "the term 'embedded in' requires more than two materials or substrates." Dkt. No. 144-2 at 14–16. In that passage, Apple was referring to a lead being positioned either "against the back surface of bezel 460" or "within the thickness of bezel 460." *Id.* at 14 (comparing '257 Patent Fig. 4A & 4B). The two materials or substrates could be the lead and the surrounding pad or the enclosure since the language does not clearly state two or more materials must encompass the lead. *Id.* The Court does not read the passage as clearly disclosing that the pad and the enclosure must be different substrates or materials.

The Court finds that an express construction is appropriate in these circumstances to resolve the parties' dispute, *see O2 Micro*, 521 F.3d at 1361, and adopts Apple's alternative construction of "at least partially set in or partially surrounded by a material."

### B.    The '533 Patent

Claim 20 recites instructions for one or more programs to be executed by processors "of a first electronic device with a display and one or more input devices including a biometric sensor." '533 Patent, claim 20. The claim requires, among the other limitations, (1) a first user interface indicating the first electronic device is ready, (2) detecting a first input with a biometric sensor, and (3) a response then an indication that the biometric information is starting to record, and displaying on a new user interface "an indication of process." *Id.*

iii.    **"a first electronic device with a display and one or more input devices**

*United States District Court*
*Northern District of California*

**including a biometric sensor" ('533 Patent, claim 20)**

| Apple's Proposed Construction | AliveCor's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "electronic device with an integrated display and one or more integrated input devices including a biometric sensor" |

The parties dispute whether a "first electronic device" must have both an integrated display, an integrated input device, and a biometric sensor contained in the same housing. Apple contends that there is no requirement that they must be physically integrated, and that the description of embodiments establishes that they need not be. Apple Br. at 19–21. AliveCor counters that the patent "repeatedly describes electronic devices with integrated input devices" and argues that every claim does not need to cover every embodiment where a patent describes multiple embodiments. AliveCor Br. at 23–25. *See Phonometrics, Inc. v. N. Telecom Inc.*, 133 F.3d 1459, 1466 (Fed. Cir. 1998) ("Although claims are not necessarily restricted in scope to what is shown in a preferred embodiment, neither are the specifics of the preferred embodiment irrelevant to the correct meaning of claim limitations.").

The ordinary meaning of the disputed term favors Apple. AliveCor asserts the natural reading of the term requires the first electronic device to "have" an integrated display and input devices, AliveCore Br. at 23, but the patent claims a device "with" a display and input devices. '533 Patent, claim 20. "[W]ith" does not exclude electronic devices performing functions via separate displays and input devices. Further, the patent does not limit "electronic devices" to portable electronic devices (like smartphones and smartwatches: "[i]n some embodiments, device 300 is … a desktop computer, … a multiplayer device," like a smart television or "a gaming system." '533 Patent at 29:66–30:6. As Apple points out, not all of those devices have integrated displays.

AliveCor further argued at the claim construction hearing that the context of the claim informs the plain meaning of the contested language. It argued that "the programming must also detect a first input with a biometric sensor that satisfies the first criteria. If you're telling the user that the first electronic device is ready to detect biometric information and then that device needs to detect it, you are pointing out, you are looking at the same device. You are not looking at

multiple devices….” Dkt. No. 160 at 86:4–10. But AliveCor's argument reads the plain language too narrowly. A "first electronic device" may be "ready to detect biometric information" from an input device that does not share the same housing, similar to a tradition ECG. '533 Patent, claim 20. Further, it is not the first electronic device but the one or more programs that has instructions for displaying the user interface. *Id.*

An embodiment related to "the tutorial for performing initial setup of the ECG management features" also supports Apple's construction of the disputed term. '533 Patent at 11:9–10, Figs. 6A–6AE. In this embodiment, a smartphone (the "first electronic device," 600A) displays a tutorial for performing the initial setup of an ECG management application, in which a user takes an ECG using a smartwatch (the "second electronic device," 600B). '533 Patent at 40:55–65. Apple argues that, as applied to Claim 20, the smartwatch functions as the "input device" while the smartphone shows an "indication of progress." Dkt. No. 160 at 78–79.[3] Apple contends that this embodiment shows that the "input device[] including a biometric sensor" and the "first electronic device" are not required to be contained in the same housing. *Id.*

AliveCor argues that claim 20 is inapplicable to this embodiment, which it contends is properly understood as illustrating dependent claim 35. In Claim 35, the first electronic device takes a biometric reading and transmits that information to the second electronic device. '533 Patent, claim 35; '533 Patent at 47:23–37. AliveCor argues that in this embodiment the smartwatch is the first electronic device that transmits the biometric information to the second electronic device, the smartphone.

AliveCor's argument rests on the doctrine of claim differentiation and is unpersuasive. Claim differentiation operates under the presumption that a dependent claim has a narrower scopes

---

[3] The patent refers to the smartwatch as the "second electronic device," 600B, in this embodiment, and the button containing a biometric sensor on the smartwatch as the "input device," 636. '533 Patent at 45:44–55. Claim 20 does not refer to a "second electronic device," but the plain language provides no reason that the "input device" may not be housed on a second electronic device or that the second electronic device may serve as an input device. Regardless, this type of arguable ambiguity in an embodiment does not meet the standard for a "clear disavowal." *See Openwave Sys. v. Apple Inc.*, 808 F.3d 509, 513 (Fed. Cir. 2015) ("[t]o find disavowal, we must find that the specification is 'both so clear as to show reasonable clarity and deliberateness, and so unmistakable as to be unambiguous evidence of disclaimer.'") (citations omitted).

11

than the associated independent claim, such that if the dependent claim adds a limitation, the independent claim does not have that limitation. *Sprint Spectrum L.P. v. General Access Solutions, Ltd.*, 812 Fed. App'x 999, 1003 (Fed. Cir. 2020) (citing *AK Steel Corp. v. Sollac & Ugine*, 344 F.3d 1234, 1242 (Fed. Cir. 2003)). Dependent claim 35 narrows independent claim 20 by requiring two biometric sensors recording two sets of biometric information. '533 Patent, claim 35. Those limitations have no bearing on whether the display and input devices must be contained in the same housing.

The Court finds that this term should be given its plain and ordinary meaning, which does not incorporate AliveCor's "integrated" limitation.

### iv.    "biometric sensor" ('533 Patent, claims 20, 21, 24)

| Apple's Proposed Construction | AliveCor's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "a sensor integrated into an input device for detecting and capturing biometric information" |

The parties' dispute whether a biometric sensor must be "integrated into an input device." Apple contends that the biometric sensor is not required to be integrated or housed within the input device, Reply Br. at 18–19, and that AliveCor's construction imports a limitation without justification from the claim language or specifications. *Id.*

When there is no ambiguity regarding the plain and ordinary meaning of a phrase, "a patentee must 'clearly set forth a definition of the disputed claim term' other than its plain and ordinary meaning." *Thorner,* 669 F.3d 1366 (quoting *CCS Fitness, Inc. v. Brunswick Corp.*, 288 F.3d 1359, 1366 (Fed. Cir. 2002). AliveCor claims the patentee defined this term in the specifications, since the biometric sensors described there were integrated into an input device. '533 Patent at 39:6–14; 45:47–64. But the specifications AliveCor relies on are expressly non-limiting examples. '533 Patent at 39:6–14 ("e.g."), 75:28–30. ("in accordance with some embodiments"). And in one embodiment, a "first electronic device," a smartphone, receives information from a biometric sensor in a "second electronic device," a smartwatch, which would mean that the sensor and first electronic device are not integrated. *Id.* at 45:51–57.

The Court finds that this term should be given its plain and ordinary meaning, which does

12

not incorporate AliveCor's "integrated" limitation.

    **v.**    **"after recording at least a portion of the biometric information, detecting, via the one or more input devices, that the first criteria are no longer met" ('533 Patent, claim 20)**

| Apple's Proposed Construction | AliveCor's Proposed Construction |
|---|---|
| Plain and ordinary meaning | "after recording at least a portion of the biometric information, detecting, via the biometric sensor that the first criteria are no longer met" |

The parties' dispute regarding this term relates to "one or more input devices," which AliveCor replaces with "biometric sensor." AliveCor contends that claim 20 only makes sense if the input devices are biometric sensors. AliveCor Br. at 29–30.

Claim 20 has two portions that AliveCor contends should be interpreted the same. The claim discusses instructions with steps that include: "detecting a first input with the biometric senor that satisfies the first criteria" then later "after recording at least a portion of the biometric information, detecting, via the one or more input devices, that the first criteria are no longer met." '533 Patent, claim 20. AliveCor contends that it "makes sense" that a biometric sensor would be "the one or more input devices" that provides "biometric information." AliveCor Br. at 30. The Court finds AliveCor's argument unpersuasive for two reasons. First, the plain language of the claim indicates that "one *or more* input devices" detect that "the first criteria are no longer met." '533 Patent, claim 20. AliveCor's construction limits the singular or plural devices to a single biometric sensor without a clear disavowal in the intrinsic record. Second, the embodiment AliveCor relies upon is only an example of this claim. *See* '533 Patent at 67:54–57 ("e.g. user contact with the biometric sensor 804 is lost"). Examples from an embodiment do not limit the otherwise clear meaning of the patent's claims. *Thorner*, 669 F.3d at 1366–67. The Court adopts the plain and ordinary meaning, which is not limited in the manner AliveCor proposes.

## IV. CONCLUSION

The Court construes the claim terms as follows:

| Claim Term | Adopted Construction |
|---|---|
| "wherein an exterior surface of the enclosure comprises an exterior surface of the first | Plain and ordinary meaning, which does not exclude an exposed first pad/electrode |

United States District Court
Northern District of California

| | |
|---|---|
| portion, wherein the first pad is positioned underneath the exterior surface of the first portion" ('257 Patent, claim 1) | |
| "embedded in" ('257 Patent, claim 1) | Plain and ordinary meaning, which is "at least partially set in or partially surrounded by a material" |
| "a first electronic device with a display and one or more input devices including a biometric sensor" ('533 Patent, claim 20) | Plain and ordinary meaning, which is not limited to an integrated display and integrated input devices |
| "biometric sensor" ('533 Patent, claims 20, 21, 24) | Plain and ordinary meaning, which is not limited to sensors integrated into an input device |
| "after recording at least a portion of the biometric information, detecting, via the one or more input devices, that the first criteria are no longer met" ('533 Patent, claim 20) | Plain and ordinary meaning, which does not require the biometric sensor to be the device that does the detecting |

The Court further **SETS** a telephonic case management conference on April 21, 2026, at 2:00 p.m.  The hearing will be held by Public Zoom Webinar.  All counsel, members of the public, and media may access the webinar information at https://www.cand.uscourts.gov/hsg.  All attorneys and pro se litigants appearing for the case management conference are required to join at least 15 minutes before the hearing to check in with the courtroom deputy and test internet, video, and audio capabilities. The Court further **DIRECTS** the parties to meet and confer and submit a joint case management statement by April 14, 2026.

**IT IS SO ORDERED.**

Dated:    3/27/2026

HAYWOOD S. GILLIAM, JR.
United States District Judge

14